RAILWAY LABOR EXECUTIVES' ASSN. *v.* GIBBONS,
TRUSTEE, ET AL.

No. 80–415.   Argued December 2, 1981—Decided March 2, 1982*

*Together with No. 80–1239, *Railway Labor Executives' Assn.* v. *Gibbons, Trustee, et al.*, on appeal from the United States Court of Appeals for the Seventh Circuit.

458

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN, J., joined, *post*, p. 473.

*John O'B. Clarke, Jr.*, argued the cause for appellant. With him on the briefs was *William G. Mahoney*.

*Elinor H. Stillman* argued the cause for the federal parties as appellees under this Court's Rule 10.4 in support of appellant. On the briefs were *Solicitor General Lee*, former *Solicitor General McCree*, former *Acting Solicitor General Wallace, Deputy Solicitor General Geller, Allen I. Horowitz, Richard A. Allen*, and *Henri F. Rush*.

*Daniel R. Murray* argued the cause for appellees. With him on the briefs were *Robert L. Stern, Milton L. Fisher, Harold L. Kaplan, Terry F. Moritz, Nicholas G. Manos, Albert E. Jenner, Jr.*, and *Barbara S. Steiner*.

JUSTICE REHNQUIST delivered the opinion for the Court.

In March 1975, the Chicago, Rock Island and Pacific Railroad Co. (Rock Island) petitioned the United States District Court for the Northern District of Illinois for reorganization under § 77 of the Bankruptcy Act of 1898, as added, 47 Stat. 1474, and amended, 11 U. S. C. § 205. Under the protection of § 77, the Rock Island continued to operate for approximately four and one-half years until it ceased all operations in September 1979 as a result of a labor strike that had depleted its cash reserves. Pursuant to 49 U. S. C. § 11125 (1976 ed., Supp. IV), the Interstate Commerce Commission (ICC) directed the Kansas City Terminal Railway Co. to provide rail service over the Rock Island lines. On January 25, 1980, the reorganization court concluded that reorganization was not possible. It then directed the Trustee of the Rock Island estate to prepare a plan for liquidation, and to continue planning for the cessation of rail operations upon the March 1980

expiration of the ICC's directed service order. App.
239a–240a. Since the entry of the January 25, 1980, order,
the Trustee has been liquidating the assets of the Rock Island
estate.

On March 4, 1980, various railroads and labor organizations
representing Rock Island employees reached an agreement
as to Rock Island employees hired by carriers acquiring the
Rock Island's trackage. The agreement covered such mat-
ters as hiring preferences, monetary protection, and senior-
ity, but it did not cover those Rock Island employees who are
not employed by acquiring carriers.

On April 14, 1980, the Rock Island Trustee petitioned the
reorganization court to confirm the Rock Island's abandon-
ment of all rail lines and operations. The reorganization
court referred the petition to the ICC for its recommenda-
tion. On May 23, the ICC concluded that the Rock Island's
abandonment and dissolution as an operating railroad was
necessary.

On June 2, the reorganization court ordered the total aban-
donment of the Rock Island system and the discontinuance of
its service. The court found that to order the Rock Island to
continue its operations indefinitely at a loss for the public's
benefit would violate the "Fifth Amendment rights of those
who have a security interest in the enterprise. *Brooks-
Scanlon Co.* v. *Railroad Commission,* 251 U. S. 396 (1920)."
*Id.,* at 270a. The reorganization court also concluded that
"no claim or arrangement of any kind or nature for employee
labor protection payable out of the assets of the Debtor's es-
tate is allowed or required by this Court" pursuant to § 17(a)
of the Milwaukee Railroad Restructuring Act (MRRA), Pub.
L. 96–101, 93 Stat. 744, 45 U. S. C. § 915(a) (1976 ed., Supp.
IV).[1] App. 271a. The court reasoned that § 17(a) of the

---

[1] Section 17(a) of MRRA provides in relevant part: "In authorizing any
abandonment pursuant to this section, the court shall require the carrier to
provide a fair arrangement at least as protective of the interests of employ-
ees as that required under section 11347 of title 49." 45 U. S. C. § 915(a)
(1976 ed., Supp. IV).

MRRA does not apply to a total, systemwide abandonment of a railroad. App. 263a–264a.

Congress responded to the crisis resulting from this demise of the Rock Island by enacting the Rock Island Railroad Transition and Employee Assistance Act (RITA), Pub. L. 96–254, 94 Stat. 399, 45 U. S. C. § 1001 *et seq.* (1976 ed., Supp. IV). The President signed the Act into law on May 30, 1980, three days before the reorganization court's abandonment order. At issue in these cases are RITA's employee protections provisions. Sections 106[2] and 110[3] re-

---

Title 49 U. S. C. § 11347 (1976 ed., Supp. IV) provides in relevant part: "[T]he Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected . . . as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. . . . The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission."

[2] Section 106, as originally enacted, provided in relevant part:

"(a) No later than 10 days after the date of enactment of this Act, in order to avoid disruption of rail service and undue displacement of employees, the Rock Island Railroad and labor organizations representing the employees of such railroad, with the assistance of the National Mediation Board, may enter into an agreement providing protection for employees of such railroad who are adversely affected as a result of a reduction in service by such railroad. Such employee protection may include, but need not be limited to, employee relocation incentive compensation, moving expenses, and separation allowances.

"(b) If the Rock Island Railroad and the labor organizations representing the employees of such railroad are unable to enter into an employee protection agreement under subsection (a) of this section within 10 days after the date of enactment of this Act, the parties shall immediately submit the matter to the Commission. The Commission shall impose upon the parties by appropriate order a fair and equitable arrangement with respect to employee protection no later than 30 days after the date of enactment of this Act, unless the Rock Island Railroad and the authorized representatives of its employees have by then entered into a labor protection agreement. For purposes of this subsection, the term 'fair and equitable' means

quire the Rock Island Trustee to provide economic benefits of up to $75 million to those Rock Island employees who are not hired by other carriers.[4]   45 U. S. C. §§ 1005, 1008 (1976 ed.,

no less protective of the interests of employees than protection afforded under section 9 of the Milwaukee Railroad Restructuring Act (45 U. S. C. 908), subject to the limitations set forth in section 110 of this title.

"(c) If an employee protection arrangement is imposed by the Commission under (b) of this section, the bankruptcy court shall immediately authorize and direct the Rock Island Railroad trustee to, and the Rock Island Railroad trustee and the labor organizations representing the employees of the railroad shall, immediately implement such arrangement.

"(e)(1) Any claim of an employee for benefits and allowances under an employee protection agreement or arrangement entered into under this section shall be filed with the [Railroad Retirement] Board . . . .

"(2) Benefits and allowances under such agreement or arrangement entered into under this section shall be paid by the Rock Island Railroad from its own assets or in accordance with section 110 of this title, and claims of employees for such benefits and allowances *shall be treated as administrative expenses of the estate of the Rock Island Railroad.*"   94 Stat. 401–402 (emphasis added).

[3] Section 110, as originally enacted, provided in relevant part:

"(a) The Secretary . . . shall guarantee obligations of the Rock Island Railroad for purposes of providing employee protection in accordance with the terms of any employee protection agreement or arrangement entered into under section 106 of this title.

"(b) Any obligation guaranteed pursuant to this section shall be treated as an administrative expense of the estate of the Rock Island Railroad.

"(c) The aggregate unpaid principal amount of obligations which may be guaranteed by the Secretary pursuant to this section shall not exceed $75,000,000.

"(d) The total liability of the Rock Island Railroad in connection with benefits and allowances provided under any employee protection agreement or arrangement entered into under section 106 of this title shall not exceed $75,000,000.

"(e) Except in connection with obligations guaranteed under this section, the United States shall incur no liability in connection with any employee protection agreement or arrangement entered into under section 106 of this title."   94 Stat. 403.

[4] Those employees hired by other carriers are covered by the March 4, 1980, agreement. *Supra,* at 460.

Supp. IV). Benefits must be paid from the estate's assets. The employee benefit obligations must be considered administrative expenses of the Rock Island estate for purposes of determining the priority of the employees' claims to the assets of the estate upon liquidation.

On June 5, 1980, appellees filed a complaint in the reorganization court seeking to declare RITA unconstitutional and to enjoin its enforcement. On June 9, the reorganization court issued a preliminary injunction prohibiting the enforcement of §§ 106 and 110 of RITA. Although it suggested that RITA might have other constitutional infirmities, the court concluded that RITA's employee protection provisions constituted an uncompensated taking of private property for a public purpose in violation of the Just Compensation Clause of the Fifth Amendment. The court reasoned: "[T]he Rock Island is a bankrupt corporation with no more operations, nothing left but assets and creditors and liquidation. Whatever obligations it may have to labor, it must arrive out of a contract that it had with labor, and any appropriate claims of labor under existing bankruptcy law is under the Railroad Retirement Act or any other statute which operates to fix the rights of labor. . . . But, these are all based upon existing law, existing rights, existing contracts, and that Congress believes it can legislate a $75 million labor protection burden on the assets of the Rock Island comes to me as a startling concept." App. 153a. Since it determined that the Rock Island is no longer subject to the obligations of an operating railroad, the court concluded that the Rock Island creditors' and bondholders' interests in the estate's remaining assets may not be taken to serve the public's interest in providing economic protection for displaced employees. *Id.*, at 154a. Appellant appealed to this Court pursuant to 28 U. S. C. § 1252 (No. 80–415).

Congress responded to the reorganization court's injunction by enacting § 701 of the Staggers Rail Act of 1980,

Pub. L. 96–448, 94 Stat. 1959. With certain modifications,[5] § 701 of the Staggers Act re-enacted RITA §§ 106 and 110. The Staggers Act also added § 124 to RITA, 45 U. S. C. § 1018 (1976 ed., Supp. IV), which sought to avoid any implication that it had deprived appellees of any Tucker Act remedy otherwise available for the Trustee and creditors to pursue their takings claim against the United States.[6] The Staggers Act was signed into law on October 14, 1980.

Six days previously, appellant and the United States had moved the reorganization court to vacate its June 9 injunction on the basis that the passage of the Staggers Act rendered the injunction moot. In addition, it was argued that no irreparable injury could be shown because the Staggers Act amendments provided that a remedy under the Tucker Act, 28 U. S. C. § 1346, would be available if the labor protection provisions were found to constitute a taking. On October 15, the reorganization court denied the motion to vacate and issued a new order enjoining implementation of the labor protection provisions of the "Rock Island Act, as amended and re-enacted by the Staggers Rail Act." App. to Juris. Statement in No. 80–1239, p. 6a. Pursuant to § 124(a)(1) of RITA, as added by the Staggers Act, 45 U. S. C. § 1018(a)(1) (1976 ed., Supp. IV),[7] appellant and the United States appealed this order to the Court of Appeals for

---

[5] In §§ 106(a) and (b), the respective time limits were shortened to five days after the enactment of the Staggers Act. The judicial review provisions of § 106(d) were modified substantially. In § 110(e), Congress added the words "to employees" after "liability," apparently in reference to the Tucker Act remedy alluded to in new § 124(c).

[6] Section 124(c) provides that "[n]othing in this chapter or in the Milwaukee Railroad Restructuring Act . . . shall limit the right of any person to commence an action in the United States Court of Claims under . . . the Tucker Act . . . ." 45 U. S. C. § 1018(c) (1976 ed., Supp. IV).

[7] Section 124(a)(1), 45 U. S. C. § 1018(a)(1) (1976 ed., Supp. IV), provides that "any decision of the bankruptcy court with respect to the constitutionality of any provision of this chapter . . . shall be taken to the United States Court of Appeals for the Seventh Circuit."

the Seventh Circuit. The Court of Appeals affirmed without opinion by an equally divided vote. *In re Chicago, R. I. & P. R. Co.*, 645 F. 2d 74 (1980) (en banc).

This Court noted probable jurisdiction in No. 80–1239 and postponed the question of jurisdiction in No. 80–415 until our hearing the case on the merits. 451 U. S. 936 (1981). In No. 80–415 we order the District Court for the Northern District of Illinois to vacate its injunction of June 9, 1980.[8] We affirm in No. 80–1239 because we conclude that RITA, as amended by the Staggers Act, is repugnant to Art. I, §8, cl. 4, the Bankruptcy Clause, of the Constitution. We therefore find it unnecessary to determine whether the employee protections provisions of RITA violate any other provision of the Constitution.[9]

Article I, §8, cl. 4, of the United States Constitution provides that Congress shall have power to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." It is necessary first to determine whether the labor protection provisions of amended RITA are an exercise of Congress' power under the Bankruptcy Clause, as contended by appellees, or under the Commerce Clause, as contended by appellant and the United States. Distinguishing a congressional exercise of power under the Commerce Clause from an exercise under the Bankruptcy Clause is admittedly not an easy task, for the two Clauses are closely related. As James Madison observed, "[t]he power of estab-

---

[8] The injunction of June 9, 1980, was rendered moot by the enactment of the Staggers Act which re-enacted and amended the sections of RITA declared unconstitutional by the reorganization court.

[9] In addition to the Bankruptcy Clause and the Just Compensation Clause of the Fifth Amendment, appellees have challenged RITA pursuant to principles of separation of powers, the equal protection component of the Fifth Amendment, and the Due Process Clause of the Fifth Amendment. We find it unnecessary to reach any of these additional contentions.

lishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42, p. 285 (N. Y. Heritage Press 1945). See *Sturges* v. *Crowninshield*, 4 Wheat. 122, 195 (1819) (Marshall, C. J.) ("The bankrupt law is said to grow out of the exigencies of commerce").

Although we have noted that "[t]he subject of bankruptcies is incapable of final definition," we have previously defined "bankruptcy" as the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief." *Wright* v. *Union Central Life Ins. Co.*, 304 U. S. 502, 513–514 (1938). See *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 673 (1935). Congress' power under the Bankruptcy Clause "contemplate[s] an adjustment of a failing debtor's obligations." *Ibid.* This power "extends to all cases where the law causes to be distributed, the property of the debtor among his creditors." *Hanover National Bank* v. *Moyses*, 186 U. S. 181, 186 (1902). It "includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the States were forbidden to do." *Id.*, at 188.

An examination of the employee protection provisions of RITA, we think, demonstrates that RITA is an exercise of Congress' power under the Bankruptcy Clause. Section 106 authorizes the ICC to impose upon the Rock Island estate "a fair and equitable" employee protection arrangement. After such an employee protection arrangement is imposed, "the bankruptcy court shall immediately authorize and direct the Rock Island trustee to . . . immediately implement such arrangement." § 106(c), 45 U. S. C. § 1005(c) (1976 ed.,

Supp. IV). Section 106(e)(2) provides that employee protection benefits shall be paid from Rock Island's assets and employee claims shall be treated as administrative expenses of the Rock Island estate. 45 U. S. C. § 1005(e)(2) (1976 ed., Supp. IV). Section 108(a) provides that any employee who elects to receive benefits under § 106 "shall be deemed to waive any employee protection benefits otherwise available to such employee" under the Bankruptcy Act, subtitle IV of Title 49 of the United States Code, or any applicable contract or agreement. 45 U. S. C. § 1007(a) (1976 ed., Supp. IV). Claims for "otherwise available" benefits are not accorded priority as an administrative expense of the estate. § 1007(c). Under § 110, the United States guarantees the Rock Island's employee protections obligations. 45 U. S. C. § 1008(a) (1976 ed., Supp. IV). As with the employee protection obligation itself, the guarantee is treated as an administrative expense of the Rock Island estate. § 1008(b).

In sum, RITA imposes upon a bankrupt railroad the duty to pay large sums of money to its displaced employees, and then establishes a mechanism through which these "obligations" are to be satisfied. The Act provides that the claims of these employees are to be accorded priority over the claims of Rock Island's commercial creditors, bondholders, and shareholders. It follows that the subject matter of RITA is the relationship between a bankrupt railroad and its creditors. See *Wright* v. *Union Central Life Ins. Co.*, *supra*, at 513–514. The Act goes as far as to alter the relationship among the claimants to the Rock Island estate's remaining assets. In enacting RITA, Congress did nothing less than to prescribe the manner in which the property of the Rock Island estate is to be distributed among its creditors.

The events surrounding the passage of RITA, as well as its legislative history, indicate that Congress was exercising its powers under the Bankruptcy Clause. In RITA, Congress was responding to the crisis resulting from the demise of the

Rock Island as an operating entity. The Act was passed almost five years after the Rock Island had initiated reorganization proceedings under § 77 of the Bankruptcy Act, and approximately 10 months after a strike had rendered the Rock Island unable to pay its operating expenses. In addition to providing for the continuation of the Rock Island under a directed service order until its lines could be acquired by other carriers, Congress sought to provide displaced employees with economic protection. Congress wanted to make liquidation of a railroad costly for the estate. As the House Conference Report explains, "it is the intention of Congress that employee protection be imposed in bankruptcy proceedings involving major rail carriers, for to do otherwise would be to promote liquidations, to the detriment of the employees and the public interest." H. R. Conf. Rep. No. 96–1430, pp. 138–139 (1980). Moreover, Congress was attempting to eliminate the confusion that existed at the time as to whether the labor protection provisions of the Interstate Commerce Act, 49 U. S. C. § 11347 (1976 ed., Supp. IV), applied to railroads that were in liquidation proceedings and arguably had no remaining common carrier responsibilities. See 126 Cong. Rec. 4870 (1980) (remarks of Sen. Kassebaum). In RITA, Congress intended that a labor protection arrangement be included as a part of the liquidation of the Rock Island estate.

We do not understand either appellant or the United States to argue that Congress may enact bankruptcy laws pursuant to its power under the Commerce Clause. Unlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power: bankruptcy laws must be uniform throughout the United States. Such uniformity in the applicability of legislation is not required by the Commerce Clause. *Hodel* v. *Indiana*, 452 U. S. 314, 332 (1981); *Secretary of Agriculture* v. *Central Roig Refining Co.*, 338 U. S. 604, 616 (1950) (distinguishing the Commerce Clause from Art. I, § 8, cl. 4). Thus, if we

were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws. It is therefore necessary for us to determine the nature of the uniformity required by the Bankruptcy Clause.

Pursuant to Art. I, § 8, cl. 4, of the Constitution, Congress has power to enact bankruptcy laws that are uniform throughout the United States. Prior to today, this Court has never invalidated a bankruptcy law for lack of uniformity. The uniformity requirement is not a straitjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner. A bankruptcy law may be uniform and yet "may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different States." *Stellwagen* v. *Clum*, 245 U. S. 605, 613 (1918). Thus, uniformity does not require the elimination of any differences among the States in their laws governing commercial transactions. *Vanston Bondholders Protective Committee* v. *Green*, 329 U. S. 156, 172 (1946) (Frankfurter, J., concurring). In *Hanover National Bank* v. *Moyses*, 186 U. S., at 189–190, this Court held that Congress can give effect to the allowance of exemptions prescribed by state law without violating the uniformity requirement. The uniformity requirement, moreover, permits Congress to treat "railroad bankruptcies as a distinctive and special problem" and "does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Regional Railroad Reorganization Act Cases*, 419 U. S. 102, 159 (1974) *(3R Act Cases)*. In the *3R Act Cases*, we upheld Congress' response to the existing rail transportation crisis in the Northeast. Since no railroad reorganization proceeding was then pending outside of the region defined by

the Regional Railroad Reorganization Act of 1973 (3R Act), 87 Stat. 985, 45 U. S. C. § 701 *et seq.*, the Act in fact operated uniformly upon all railroads then in bankruptcy proceedings.

But a quite different sort of "uniformity" question is presented in these cases. By its terms, RITA applies to only one regional bankrupt railroad.[10] *Only* Rock Island's creditors are affected by RITA's employee protection provisions and *only* employees of the Rock Island may take benefit of the arrangement. Unlike the situation in the *3R Act Cases,* there are other railroads that are currently in reorganization proceedings,[11] but these railroads are not affected by the employee protection provisions of RITA. The conclusion is thus inevitable that RITA is not a response either to the particular problems of major railroad bankruptcies or to any geographically isolated problem: it is a response to the problems caused by the bankruptcy of *one* railroad. The employee protection provisions of RITA cover neither a defined class of debtors nor a particular type of problem, but a particular

---

[10] By contrast, the 3R Act applied to the reorganization proceedings of 8 major railroads and 15 lessors of leased lines of the Penn Central. *3R Act Cases,* 419 U. S., at 108–109, n. 3.

[11] At the time RITA was enacted, the New York, Susquehanna and Western Railroad was in the process of liquidation under § 77 of the Bankruptcy Act of 1898. *In re New York, S. & W. R. Co.,* 504 F. Supp. 851 (NJ 1980), aff'd, 673 F. 2d 1301 (CA3 1981). Another bankrupt railroad is undergoing liquidation proceedings under the Bankruptcy Act of 1978, 11 U. S. C. §§ 1161–1174 (1976 ed., Supp. IV). *In re Auto-Train Corp.,* 11 B. R. 418 (Bkrtcy. DC 1981). The Milwaukee Road is in an income-based reorganization. That railroad is subject to its own employee protection requirements under §§ 5 and 9 of the MRRA, 45 U. S. C. §§ 904, 908 (1976 ed., Supp. IV). As with the case of §§ 106 and 108 of RITA, these sections of the MRRA apply only to one railroad. We have no occasion in these cases to consider the constitutionality of these provisions of the MRRA. Nevertheless, it is no argument that RITA is uniform because another statute imposes similar obligations upon another railroad, as the United States appears to contend. The issue is not whether Congress has discriminated against the Rock Island estate, but whether RITA's employee protection provisions are uniform bankruptcy laws. The uniformity requirement of the Bankruptcy Clause is not an Equal Protection Clause for bankrupts.

problem of one bankrupt railroad. Albeit on a rather grand scale, RITA is nothing more than a private bill such as those Congress frequently enacts under its authority to spend money.[12]

The language of the Bankruptcy Clause itself compels us to hold that such a bankruptcy law is not within the power of Congress to enact. A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor. *In re Sink*, 27 F. 2d 361, 362 (WD Va. 1928), appeal dism'd per stipulation, 30 F. 2d 1019 (CA4 1929). As the legislative history to the Staggers Act indicates, *supra*, at 468, Congress might deem it sound policy to impose labor protection obligations in all bankruptcy proceedings involving major railroads. By its specific terms, however, RITA applies to only one regional bankrupt railroad, and cannot be said to apply uniformly even to major railroads in bankruptcy proceedings throughout the United States. The employee protection provisions of RITA therefore cannot be said to "apply equally to all creditors and all debtors." *3R Act Cases, supra*, at 160.

Although the debate in the Constitutional Convention regarding the Bankruptcy Clause was meager, we think it lends some support to our conclusion that the uniformity requirement of the Clause prohibits Congress from enacting bankruptcy laws that specifically apply to the affairs of only one named debtor.

The subject of bankruptcy was first introduced on August 29, 1787, by Charles Pinckney during discussion of the Full Faith and Credit Clause. Pinckney proposed the following grant of authority to Congress: "To establish uniform laws upon the subject of bankruptcies, and respecting the dam-

---

[12] By its very terms, RITA applies only to the Rock Island. 45 U. S. C. §§ 1001, 1005, 1007–1008 (1976 ed., Supp. IV). Thus, we have no occasion to review a bankruptcy law which defines by identifying characteristics a particular class of debtors. Cf. *3R Act Cases, supra*, at 156–160.

ages arising on the protest of foreign bills of exchange." 2 M. Farrand, Records of the Federal Convention of 1787, p. 447 (1911). Two days later, John Rutledge recommended that the following be added to Congress' powers: "To establish uniform laws on the subject of bankruptcies." *Id.*, at 483. The Bankruptcy Clause was adopted on September 3, 1787, with only Roger Sherman of Connecticut voting against. *Id.*, at 489.[13]

Prior to the drafting of the Constitution, at least four States followed the practice of passing private Acts to relieve individual debtors. Nadelmann, On the Origin of the Bankruptcy Clause, 1 Am. J. Legal Hist. 215, 221–223 (1957). Given the sovereign status of the States, questions were raised as to whether one State had to recognize the relief given to a debtor by another State. See *Millar* v. *Hall*, 1 Dall. 229 (Pa. Sup. Ct. 1788); *James* v. *Allen*, 1 Dall. 188 (Pa. Ct. Common Pleas 1786). Uniformity among state debtor insolvency laws was an impossibility and the practice of passing private bankruptcy laws was subject to abuse if the legislators were less than honest. Thus, it is not surprising that the Bankruptcy Clause was introduced during discussion of the Full Faith and Credit Clause. The Framers sought to provide Congress with the power to enact uniform laws on the subject enforceable among the States. See Nadelmann, *supra*, at 224–227. Similarly, the Bankruptcy Clause's uniformity requirement was drafted in order to prohibit Congress from enacting private bankruptcy laws. See H. Black, Constitutional Prohibitions 6 (1887) (States had discriminated against British creditors). The States' practice of enacting private bills had rendered uniformity impossible.[14]

---

[13] "Mr. Sherman observed that Bankruptcies were in some cases punishable with death by the laws of England—& He did not chuse to grant a power by which that might be done here." 2 M. Farrand, Records of the Federal Convention of 1787, p. 489 (1911).

[14] The Framers' intent to achieve uniformity among the Nation's bankruptcy laws is also reflected in the Contract Clause. Apart from and independently of the Supremacy Clause, the Contract Clause prohibits the

Our holding today does not impair Congress' ability under the Bankruptcy Clause to define classes of debtors and to structure relief accordingly. We have upheld bankruptcy laws that apply to a particular industry in a particular region. See *3R Act Cases*, 419 U. S. 102 (1974). The uniformity requirement, however, prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor. To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors. A bankruptcy law, such as RITA, confined as it is to the affairs of one named debtor can hardly be considered uniform. To hold otherwise would allow Congress to repeal the uniformity requirement from Art. I, §8, cl. 4, of the Constitution.

Since that result may be accomplished only by the process prescribed in that document for its amendment, the judgment of the Court of Appeals in No. 80–1239 is affirmed, and the judgment of the District Court in No. 80–415 is vacated with instructions to dismiss the complaint as moot. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950).

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, concurring in the judgment.

I agree with the Court that the Rock Island Railroad Transition and Employee Assistance Act (RITA) violates the uniformity requirement of the Bankruptcy Clause. I write separately, however, because the Court accords a broader scope to that requirement than the Clause's language, its history, and the Court's cases justify. In particular, I am concerned that the Court's rationale may unduly restrict Congress' power to legislate with respect to the distinctive needs of a

---

States from enacting debtor relief laws which discharge the debtor from his obligations, *Sturges* v. *Crowninshield*, 4 Wheat. 122, 197–199 (1819), unless the law operates prospectively. *Ogden* v. *Saunders*, 12 Wheat. 213 (1827).

particular railroad or its employees. I conclude that the Clause permits such legislation if Congress finds that the application of the law to a single debtor (or limited class of debtors) serves a national interest apart from the economic interests of that debtor or class, and if the identified national interest justifies Congress' failure to apply the law to other debtors. However, because RITA does not satisfy this more stringent test, I agree that RITA is unconstitutional.

The Court argues that the uniformity requirement forbids Congress to enact any bankruptcy law affecting a single debtor. But I do not believe that uniformity invariably requires that a bankruptcy law apply to a multiplicity of debtors. The term "uniform" does not necessarily imply either that the law must avoid specifying the debtors to which it applies or that the law must affect more than a single debtor. As we have noted in different contexts, a named individual may constitute a "legitimate class of one." *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 472 (1977) (rejecting claim that statute applying, and referring by name, only to a single former President is a bill of attainder). Cf. *Morey* v. *Doud*, 354 U. S. 457 (1957) (invalidating a statute expressly exempting the American Express Co. by name), overruled in *New Orleans* v. *Dukes*, 427 U. S. 297 (1976) *(per curiam)*.

In reviewing the scanty history of the Clause, the Court notes that one principal purpose was to avoid conflict between state laws concerning debtor insolvency. That concern, of course, is satisfied simply by uniform interstate application of federal bankruptcy laws under the Supremacy Clause. Another purpose, according to the Court, may have been to prevent the passage of private Acts to relieve individual debtors. However, the references to private Acts contained in the debates may have been intended only as examples of the first problem, in that other States failed to give credit to such Acts. To the extent that the Framers were concerned about the passage of private Acts, the question re-

mains whether they intended to prohibit all such Acts, and thus to disable Congress from enacting legislation applying to a specified debtor but promoting more general national policies than the simple economic interests of the debtor.

Our cases do not support the Court's view that any bankruptcy law applying to a single named debtor is unconstitutional. In the most relevant case, *Regional Rail Reorganization Act Cases*, 419 U. S. 102 (1974) *(3R Act Cases),* this Court held that the Regional Rail Reorganization Act did not violate the Uniformity Clause even though it applied only to eight railroads in a specified geographic region. The Court squarely rejected the argument that the geographic nonuniformity of the Rail Act violated the Bankruptcy Clause. "The argument has a certain surface appeal but is without merit because it overlooks the flexibility inherent in the constitutional provision." *Id.*, at 158. Reviewing earlier cases, the Court emphasized Congress' power to recognize geographic differences and "to fashion legislation to resolve geographically isolated problems." *Id.*, at 159. The Court also noted that no other railroad was in reorganization during the time that the Act applied. The Court concluded that the Act satisfies the uniformity requirement because it is "designed to solve 'the evil to be remedied.'" *Id.*, at 161, quoting *Head Money Cases*, 112 U. S. 580, 595 (1884).

The Court's analysis in this case, too, "has a certain surface appeal." If a law applies to one debtor, it is invalid; if it applies to more than one debtor, it is valid if it satisfies the *3R Act Cases* test, *i. e.*, if it was designed to solve an identified evil. But there is nothing magical about a law that specifies only one object. I discern no principled ground for refusing to apply the same test without regard to the number of businesses regulated by the law.[1]

---

[1] The Court implies that a law which is general in its terms but in operation applies only to a single debtor might satisfy the uniformity requirement. Again, such a formalistic requirement is not a principled reason for striking down congressional legislation.

I would apply the *3R Act Cases* test in every instance. Congress may specify what debtors, or (which is often the same thing) what portion of the country, will be subject to bankruptcy legislation. The constraint of uniformity, however, requires Congress to legislate uniformly with respect to an identified "evil." In the Regional Rail Reorganization Act, Congress imposed certain requirements on all railroads in reorganization; all were deemed to present the same "evil." If Congress has legislated pursuant to its bankruptcy power, furthering federal bankruptcy policies, and if the specificity of the legislation is defensible in terms of those policies, then, but only then, has Congress satisfied the uniformity requirement. Where, as here, the law subjects one named debtor to special treatment, I would require especially clear findings to justify the narrowness of the law.

Although the question is close, I conclude that Congress did not justify the specificity of RITA in terms of national policy. Rather, the legislative history indicates an attempt simply to protect employees of a single railroad from the consequences of bankruptcy. No explanation for the specificity of the law is given that would justify such narrow application. In its statutory findings, Congress stated that "uninterrupted continuation of services over Rock Island lines is dependent on adequate employee protection provisions," and that a cessation of services would seriously affect certain state economies and the shipping public. 45 U. S. C. § 1001 (1976 ed., Supp. IV). The findings explicitly refer, however, only to the Rock Island Railroad. To be sure, in the legislative history Congress did recite more general purposes. Congressional Reports advert to the need for labor protection in "bankruptcy proceedings involving major rail carriers," H. R. Conf. Rep. No. 96–1430, p. 139 (1980), and the need "to avoid disruption of rail service and undue displacement of employees." H. R. Conf. Rep. No. 96–1041, p. 26 (1980). See S. Rep. No. 96–614, p. 5 (1980). But recitation of a general purpose does not justify narrow application to a

single debtor where, as here, that purpose does not explain the nonuniform treatment of other comparable railroads that are now, or may be, in reorganization. See *ante*, at 470, n. 11. With respect to such railroads, reorganization will result in the same displacement of employees and disruption of service—the same "evil"—that Congress purported to address in RITA. Because Congress' findings fail to demonstrate that the narrowness of RITA is addressed to a particular kind of problem, the law does not satisfy the uniformity requirement.

I agree with the Court that "[t]he employee protection provisions of RITA cover neither a defined class of debtors nor a particular type of problem, but a particular problem of one bankrupt railroad." *Ante*, at 470–471. I do not agree that Congress may not legislate with respect to a single debtor, even if only that debtor presents "a particular type of problem." If, for example, Consolidated Rail Corp. were to fail, I cannot believe that Congress would be prohibited from enacting legislation addressed to the peculiar problems created by the bankruptcy of one of the Nation's principal freight carriers.[2]

For the foregoing reasons, I concur in the result reached by the Court.

---

[2] It is indeed ironic that under the Court's approach, bankruptcy legislation respecting Conrail might be invalid. Conrail was created by the 3R Act, which reorganized eight bankrupt railroads into a single viable system operated by a private, for profit corporation. It is difficult to understand why legislation affecting the eight railroads passed constitutional muster in the *3R Act Cases*, 419 U. S., at 156–161, yet legislation affecting their successor might not.