[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14514
_____

D.C. Docket Nos. 1:13-cv-00209-JRH-BKE; 11-bkc-10218-SDB

In Re: THOMAS J. MCFARLAND,

                                                                                    Debtor.

_____

THOMAS J. MCFARLAND,

                                                                      Plaintiff - Appellant,

versus

A. STEPHENSON WALLACE,

                                                                      Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(June 22, 2015)

Before TJOFLAT, WILLIAM PRYOR, and BALDOCK,[*] Circuit Judges.

BALDOCK, Circuit Judge:

After filing for bankruptcy in 2011, Thomas McFarland claimed a number of exemptions from his bankruptcy estate. This appeal concerns two such claims, which are opposed by Trustee A. Stephenson Wallace. Before us, McFarland requests exemption for: (1) an annuity worth well over $150,000; and (2) the nearly $15,000 cash surrender value of a whole life insurance policy. The bankruptcy and district courts denied McFarland both exemptions. Exercising jurisdiction under 28 U.S.C. § 158(d), we affirm.

## I. BACKGROUND

### A. Bankruptcy law

Under federal law, when a debtor files for bankruptcy his property becomes part of the bankruptcy estate and is thereby exposed to creditors. *See* 11 U.S.C. § 541(a)(1). The debtor, however, may exempt certain types of property from this exposure. *See id.* § 522; *Rousey v. Jacoway*, 544 U.S. 320, 325, 125 S.Ct. 1561, 1565–66 (2005). That said, the Bankruptcy Reform Act of 1978 permitted states to opt out of the exemptions in 11 U.S.C. § 522(d). *See* 11 U.S.C. § 522(b)(2). If a state opts out, debtors in that state cannot utilize the § 522(d) exemptions, though

---

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

they may take advantage of "any exemptions available under state or local law and federal, non-bankruptcy law." *Sheehan v. Peveich*, 574 F.3d 248, 251 (4th Cir. 2009); *id.* § 522(b)(3). In general, courts may not refuse to honor an exemption— state or federal—"absent a valid statutory basis for doing so." *Law v. Siegel*, ___U.S.___, 134 S.Ct. 1188, 1196 (2014).

Back in 1980, Georgia opted out and created its own exemptions "for purposes of bankruptcy." Ga. Code Ann. § 44-13-100; *Silliman v. Cassell*, 738 S.E.2d 606, 609 (Ga. 2013). Two Georgia exemptions are at issue here. First, under Georgia Code § 44-13-100(a)(2)(E), a bankruptcy debtor may exempt

> [a] payment under a pension, *annuity*, or *similar plan or contract* on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor[.]

Ga. Code Ann. § 44-13-100(a)(2)(E) (emphases added). Under § 44-13-100(a)(9), a bankruptcy debtor may exempt

> [t]he debtor's aggregate interest, *not to exceed $2,000.00 in value, . . .* in any accrued dividend or interest under, or loan or cash value of, any *unmatured life insurance contract* owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent[.]

*Id.* § 44-13-100(a)(9) (emphases added). Also key here is a non-bankruptcy provision from the Georgia Code—section 33-25-11(c)—which states that

> [t]he *cash surrender values of life insurance policies* issued upon the lives of citizens or residents of this state, upon whatever form, *shall not in any case be liable to attachment, garnishment, or legal process in favor of any creditor* of the person whose life is so insured . . . .

3

*Id.* § 33-25-11(c) (emphases added). Title 33 contains the Georgia Insurance Code, which "extensively and exhaustively regulates, at the state level, all aspects of the insurance industry in Georgia." *Cotton States Mut. Ins. Co. v. DeKalb Cnty.*, 304 S.E.2d 386, 389 (Ga. 1983).

## B. Facts

Many years ago, while serving in the United States Army, Thomas McFarland obtained a mutual fund. Then, in 1984, McFarland took out a $30,000 whole life insurance policy. In 2006, at the age of 64, McFarland transferred $150,000 from his mutual fund into a newly created annuity from The Hartford company (hereinafter the "Annuity"). The Annuity contract designated McFarland's wife as the sole beneficiary, and it stated that the Annuity's "Commencement Date"—*i.e.*, the date the Annuity would begin disbursing payments—was January 15, 2032.

In February 2011, McFarland declared Chapter 7 bankruptcy. He eventually claimed, *inter alia*, the following two exemptions under the law of Georgia, where he was domiciled. First, McFarland claimed the full cash surrender value (approximately $13,445) of his whole life insurance policy was exempt under Georgia Code § 33-25-11(c). Second, McFarland claimed his Annuity (by then worth around $170,000) was exempt under § 44-13-100(a)(2)(E). A. Stephenson Wallace, the Trustee, objected. The bankruptcy court restricted McFarland's life

4

insurance exemption to the $2,000 limit found in § 44-13-100(a)(9), *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012), and it denied the Annuity exemption in its entirety, *Wallace v. McFarland* (*In re McFarland*), 500 B.R. 279 (Bankr. S.D. Ga. 2013).  The district court affirmed.  *McFarland v. Wallace*, 516 B.R. 665 (S.D. Ga. 2014).

## II. STANDARD OF REVIEW

"We review the district court's decision to affirm the bankruptcy court *de novo*, which allows us to assess the bankruptcy court's judgment anew, employing the same standard of review the district court itself used." *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009).  "Thus, we review the bankruptcy court's factual findings for clear error, and its legal conclusions *de novo*." *Id.*

Generally speaking, courts construe bankruptcy exemption statutes—both state and federal—liberally in favor of bankruptcy debtors.  *See, e.g.*, *Lampe v. Williamson* (*In re Lampe*), 331 F.3d 750, 754 (10th Cir. 2003); *Caron v. Farmington Nat'l Bank* (*In re Caron*), 82 F.3d 7, 10 (1st Cir. 1996); *Silliman v. Cassell* (*In re Cassell*), 443 B.R. 200, 203 (Bankr. N.D. Ga. 2010).[1]  And under Rule 4003(c) of the Federal Rules of Bankruptcy Procedure, the burden is on the party objecting to exemptions to prove, by a preponderance of evidence, "that the exemptions are not properly claimed."  Thus, we will construe the exemptions here

---

[1]  We assume, without deciding, that this is the correct position.

5

liberally in favor of McFarland, and we will look to Wallace for a demonstration that the exemptions are inapplicable.

### III. ANNUITY EXEMPTION

McFarland contends there is no valid statutory basis for ruling that Georgia intended to limit the relevant exemption statutes in ways unfavorable to him. Our analysis of his arguments begins with the Hartford Annuity.

To review, Georgia Code § 44-13-100(a)(2)(E) allows a debtor to exempt, from the bankruptcy estate, a payment under an "annuity" or a "similar plan or contract." McFarland argues his Annuity qualifies under this statute. The bankruptcy and district courts disagreed. Thus, we must first determine whether McFarland's Annuity falls within the statutory definition of the term "annuity." In our view, it does not.

Helpfully, the Supreme Court of Georgia recently defined "annuity" as the word is used in § 44-13-100(a)(2)(E). *See Silliman*, 738 S.E.2d at 606–10; *Silliman v. Cassell* (*In re Cassell*), 688 F.3d 1291 (11th Cir. 2012) (certifying this issue to the Georgia Supreme Court). The court concluded that an "annuity" under § 44-13-100(a)(2)(E) "is an obligation to pay an amount at *regular intervals* for a certain or uncertain period of time." *Silliman*, 738 S.E.2d at 610 (emphasis added); *see also Rousey*, 544 U.S. at 330, 125 S.Ct. at 1569 ("[A]n annuity is 'an amount payable yearly or at other regular intervals . . . .'" (citation omitted)). Moreover, the court explained, "in deciding whether a particular annuity is of the type

6

intended to come within the . . . § 44-13-100(a)(2)(E) exemption, the pertinent question is *whether it provides income as a substitute for wages*." *Silliman*, 738 S.E.2d at 610 (emphasis added).  A trustee must therefore show "that the payments were not intended to substitute for wages." *Id.* at 612.  Wallace has easily done so.

The bankruptcy court found (and the district court affirmed) that McFarland's Annuity did not qualify under § 44-13-100(a)(2)(E) because it was structured more like a future investment than a substitute for wages.  *See In re McFarland*, 500 B.R. at 285.  The bankruptcy court emphasized that McFarland had never—not once—drawn money from the Annuity, and that he did not intend to withdraw any funds during his lifetime.  *See id.* at 282, 285–86.

This reasoning is sound, and the bankruptcy court's findings of fact are not clearly erroneous.  Indeed, McFarland concedes on appeal that he has never drawn money from the Annuity and says he was not planning on doing so until 2032 *at the earliest*—when he would be 90 years old.  At a hearing before the bankruptcy court in September 2011, McFarland made similar admissions:

> [Wallace:] Have you taken any payments out from the annuity?
>
> [McFarland:] No, sir.  I got that annuity mainly for my wife when I passed.
>
> [Wallace:] In fact, you don't intend to take any payments out of that annuity, do you?
>
> [McFarland:] I hope not.  I'm trying to save it for my wife.  I'm seven years older than she is and according to the Vietnam mortality tables, my [life] expectancy is only 2017.

Aplt's App., Exhibit 7, at 15.  As if that was not enough, earlier in 2011 McFarland made similar statements at three separate examinations.  *See* Aple's App., Exhibit 1-32, at 45–46 (June 2011 bankruptcy examination) ("[Wallace:] Do you intend to withdraw any money from this [Annuity] in your lifetime?  [McFarland:] No, sir."); *id.*, Exhibit 1-33, at 26 (August 2011 deposition) ("[McFarland:] "I considered the annuity to be critical to [my wife's] future."); *id.*, Exhibit 1-34, at 25–26 (March/April 2011 creditor meeting) ("[Bell:] But [the Annuity is] just the way you chose to invest your money for retirement?  [McFarland:] Yes. [Wallace:] Have you started drawing funds down from the annuity?  [McFarland:] No.").[2]  These multiple, explicit concessions plainly preclude McFarland from this exemption, as they make it impossible for him to claim with any believability that his Annuity was operating as, or truly intended to be, a wage substitute distributed at "regular intervals" to him and his wife during his retirement.[3]

Other courts have adhered to this logic when dealing with Georgia law.  For example, a different bankruptcy court in the Southern District of Georgia recently

---

[2]  Interestingly, at this creditor meeting, McFarland claimed he had planned on drawing money from the Annuity when he turned 70 the next year.  Aple's App., Exhibit 1-34, at 26.  McFarland contradicted this assertion at subsequent hearings, however, and he has not raised the assertion on appeal or provided any evidence to support such a claim.

[3]  Courts typically review a variety of factors in deciding whether an annuity qualifies for exemption.  *See Silliman*, 738 S.E.2d at 611 (referencing factors listed in *Andersen v. Ries* (*In re Andersen*), 259 B.R. 687, 691–92 (8th Cir. BAP 2001)).  We will not sift through these factors point-by-point here, as the above concessions clearly answer *Silliman*'s "pertinent question." The bankruptcy court, however, did an admirable job of applying these factors to McFarland's Annuity.  *See In re McFarland*, 500 B.R. at 284–87.

ruled that a debtor could not exempt her annuity under § 44-13-100(a)(2)(E). *See Boudreaux v. Sheffield* (*In re Sheffield*), 507 B.R. 400 (Bankr. S.D. Ga. 2014). Sheffield's "choice to defer any and all payments under the Annuity until she is ninety years old," the court wrote, "shows that the Annuity was intended to be more like an investment and less like an exemptible contract to provide retirement funds." *Id.* at 408. A Northern District of Georgia bankruptcy court spoke similarly in 2005. *See In re Michael*, 339 B.R. 798 (Bankr. N.D. Ga. 2005). There, the annuity in question deferred payments until 2050—when the debtor would turn 85—and the debtor had yet to receive any payments whatsoever. *Id.* at 800. For reasons that included the following logic, the *Michael* court declined to exempt the annuity:

> Allowing an annuity contract established by a debtor to be exempt without some requirements that it be similar to other qualified retirement plans would provide debtors with a means of shielding assets from creditors prebankruptcy by purchasing annuities under the *facade of retirement planning*. The Annuity Contract in this case is *no different than a savings account* created on the premise that the funds placed in the account are to provide Debtor with *future income* . . . .

*Id.* at 806 (emphases added).

McFarland attempts to avoid this obvious conclusion by arguing the Annuity was actually structured and intended to supplement his income. For starters, he contends we should not go beyond the plain language of his Annuity contract, which (he says) clearly meets *Silliman*'s definition of an annuity. This argument

9

misses the mark.  Unquestionably, *Silliman* held that a debtor's annuity qualified for exemption, and the court indicated we should look at the "nature of the contract" for guidance.  *Silliman*, 738 S.E.2d at 610–11.  That said, McFarland's contract here clearly states he will not begin to receive payments until 2032, when McFarland would turn 90 years old.  This confirms, rather than undermines, our belief that McFarland's Annuity was obviously not intended to be, or operating as, a wage replacement.  *See In re Sheffield*, 507 B.R. at 408.  It also greatly distinguishes *Silliman*, where the qualifying annuity contract stated payments would begin within *one month* of the contract's creation.  *See* 738 S.E.2d at 608.

In any event, rather than strictly limiting us to the contract's text, *Silliman* says we must also look to the "facts and circumstances surrounding the purchase of the annuity."  *Id.* at 610–11.  And the facts here doom McFarland's claim.  As discussed, McFarland has never withdrawn any money from his Annuity and had no real plans to do so.  The *Silliman* debtor, in contrast, "purchased the annuity to replace her income . . . at the time of purchase," and she *had already begun receiving payments* when she filed for bankruptcy.  *Id*. at 611. [4]

---

[4]  The facts here also distinguish *Rousey*, which is the Supreme Court decision most on point. *Rousey* held that two debtors' IRA accounts qualified as "similar plan[s] or contract[s]" under 11 U.S.C. § 522(d)(10)(E), which parallels Georgia Code § 44-13-100(a)(2)(E).  *See* 544 U.S. at 322–24, 125 S.Ct. at 1564–65.  To be precise, the Court determined that "the income the Rouseys will derive from their IRAs is . . . income that *substitutes for wages*."  *Id.* at 331, 125 S.Ct. at 1569 (emphasis added).  In reaching this conclusion, the Court found that distribution from the IRAs was scheduled "to begin *at the latest* in the calendar year after the year in which the accountholder turns 70 ½" and that tax penalties were in place "to ensure that the beneficiary

In an alternative vein, McFarland insists we should rely on additional testimony from all the hearings cited above to exempt his Annuity. For example, McFarland's son, who was also his financial advisor, testified that the Annuity was originally intended to "provide a lifetime income stream." *See* Aplt's App., Exhibit 7, at 53–54. And McFarland testified the Annuity was intended both for his wife after he died *and* as a backup source of funds while he lived "if we needed it." *Id.* at 72. McFarland's testimony is easily dismissed, as the copious concessions above demonstrate that McFarland never "needed" to use the Annuity, nor did he ever plan on "need[ing]" to use the Annuity. Moreover, his son's testimony is taken out of context. Soon after making the above statement, his son clarified that the Annuity was mostly meant to provide for McFarland's wife *after* he died. *See id.* at 57 ("[Wallace:] So did he purchase this annuity to cover his future income or to . . . leave an inheritance for your mother? [Son:] It was more for protecting my mother."); *id.* at 59–60 ("[Bell:] And that [Annuity] was not for wage replacement. It was for other purposes? [Son:] Yeah. [Bell:] That's correct, isn't it? . . . [Son:] Yes. . . . [Bell:] And he has not withdrawn any funds from that to this point? [Son:] No, he has not." ). McFarland is sunk—not rescued—by the

---

use[d] the IRA *in his retirement years*" and did not allow funds to "*improperly* remain[] in the account." *Id.* at 331–32, 125 S.Ct. at 1569 (emphases added). Thus, the Court noted, the *Rousey* debtors (unlike McFarland) "*must* begin to withdraw funds when they are likely to be retired and lack wage income." *Id.* at 331, 125 S.Ct. at 1569 (emphasis added).

11

full testimony in this case.  At minimum, given the above, we could not possibly find that the district court's factual findings were clearly erroneous here.

Finally, McFarland argues that even if his Annuity does not qualify as an "annuity" under the statute, it should at least qualify as a "similar plan or contract." McFarland did not raise this argument in the bankruptcy court, so we need not consider it here.  *See Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998).[5]  Regardless, "the common factor among exempt plans is that they *provide a substitute for wages*."  *Silliman*, 738 S.E.2d at 611 (emphasis added); *see also Rousey*, 544 U.S. at 329, 125 S.Ct. at 1568 ("We agree with the Rouseys that IRAs are similar to the plans specified in [11 U.S.C. § 522(d)(10)(E)] . Those plans, like the Rouseys' IRAs, provide a substitute for wages . . . and *are not mere savings accounts*." (emphasis added)).  Thus, McFarland would likely fare no better relying on the "similar plan or contract" language.

## IV. LIFE INSURANCE EXEMPTION

### A. Statutory analysis

Georgia Code § 44-13-100(a)(9) explicitly limits—at $2,000—a bankruptcy debtor's ability to exempt the "cash value" of his "unmatured life insurance contract."  Nevertheless, McFarland contends he should be permitted to rely on

---

[5]  We also need not decide whether McFarland's Annuity was "reasonably necessary" for support for him and his wife.  It seems unlikely, however, that the Annuity would qualify under this prong.  *See, e.g.*, Aplt's App., Exhibit 7, at 60–63 (testimony from McFarland's son that McFarland is apparently able to meet his financial obligations without help from the Annuity, and that his wife has a separate, similarly sized and structured annuity in her own name).

Georgia Code § 33-25-11(c)—a non-bankruptcy provision—to exempt the *entire* cash value of his whole life insurance policy. (This would allow him to exempt an additional $11,000 or so from the bankruptcy estate.) The bankruptcy court disagreed and capped McFarland's life insurance exemption at $2,000. Thus, we must decide whether McFarland was stuck with § 44-13-100(a)(9) or whether he could use a provision protecting debtors more generally. In our view, he was restricted to $2,000 under Georgia's explicit bankruptcy provision.

According to McFarland, federal law allows him to exempt property beyond that which is covered by explicit Georgia bankruptcy statutes. *See* 11 U.S.C. §§ 522(b)(3)(B) & 541(c)(2) (allowing bankruptcy debtors to exempt property that is protected "under applicable non-bankruptcy law"); *see also Meehan v. Wallace* (*In re Meehan*), 102 F.3d 1209 (11th Cir. 1997) (allowing bankruptcy debtor to rely on non-bankruptcy Georgia statute to exclude IRA from bankruptcy estate). McFarland also contends nothing in the text or immediate context of Georgia Code § 33-25-11(c) indicates it cannot be utilized by a bankruptcy debtor.

Even assuming McFarland is correct on these two points, it is well-settled that "[f]or purposes of statutory interpretation, a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent." *Vines v. State*, 499 S.E.2d 630, 632 (Ga. 1998). So, regardless of the lack of limiting language in § 33-25-11, McFarland can only use § 44-13-100(a)(9) because *that* statute specifically restricts bankruptcy debtors to a cash value life insurance

13

exemption of $2,000.  Put differently, although Georgia allows debtors, in general, to utilize § 33-25-11(c), Georgia restricts *bankruptcy* debtors to $2,000 with § 44-13-100(a)(9).  The specific trumps the general, plain and simple.[6]

To be sure, one could argue—although McFarland does not do so—that by enacting § 33-25-11 in 2006 Georgia intended to amend, clarify, or repeal § 44-13-100(a)(9), which had been on the books since 1980.  This argument, though, would require textual evidence of the Georgia Legislature's intent.  *See Vines*, 499 S.E.2d at 632.  And again, McFarland does not attempt to prove such intent.[7]  Instead, McFarland asserts that §§ 33-25-11(c) and 44-13-100 do not entirely overlap.  Most significantly, he points out, § 33-25-11(c) applies to Georgia residents and citizens, whereas § 44-13-100(a)(9) applies regardless of residency or citizenship.[8]  Therefore, McFarland claims, it is perfectly plausible that Georgia intended for the two statutes to coexist in a manner different than what we have described above:

---

[6]  Eleven U.S.C. §§ 522(b)(3)(B) and 541(c)(2) do not help McFarland because Georgia has made Ga. Code Ann. § 33-25-11(c) *inapplicable* to him through § 44-13-100(a)(9).

[7]  Several bankruptcy courts have concluded that Georgia did not intend to repeal or amend § 44-13-100(a)(9).  *See In re Dean*, 470 B.R. 643, 648 (Bankr. M.D. Ga. 2012) ("[N]othing in the history or language of § 33–25–11(c) indicates the legislature intended it to apply in bankruptcy."); *Roach v. Ryan* (*In re Ryan*), No. 11-40712, 2012 WL 423854, at *2 (Bankr. S.D. Ga. Jan. 19, 2012) (similar); *In re Allen*, No. 10-50827, 2010 WL 3958171, at *4 (Bankr. M.D. Ga. Oct. 4, 2010) (similar).  We need not reach this issue.

[8]  He gives other examples, as well.  For instance, § 33-25-11(c) applies to the "cash surrender value[]" of the life insurance policy, whereas § 44-13-100(a)(9) applies to the "loan *or* cash value."  Moreover, § 33-25-11(c) does not apply to dependents, whereas § 44-13-100(a)(9) does.

> [T]he two statutory provisions are not identical, do not apply to identical classes of individuals, and apply to different interests in life insurance policies. These distinctions are not merely semantic, and provide a rational basis for Georgia to enact two different provisions, either or both of which may, or may not, be available to a bankruptcy debtor if the debtor and the asset qualify under each statute.

Aplt's Br., at 8–9. Applying this argument to his situation, McFarland contends Georgia intended for bankruptcy debtors who are *residents* to have access to § 33-25-11(c)'s broad policy and for *non*-resident bankruptcy debtors to be limited to $2,000 by § 44-13-100(a)(9). At minimum, McFarland protests, we must adopt this view because of our duty to construe exemptions liberally.

In liberally construing exemption statutes, though, we cannot ignore a statute's plain language. *See Carter v. Progressive Mountain Ins.*, 761 S.E.2d 261, 264 (Ga. 2014) ("When we consider the meaning of a statute, we look first to the text of the statute, and if the text is clear and unambiguous, we look no further, attributing to the statute its plain meaning." (citation and internal marks omitted)). Again, § 44-13-100(a)(9) says a bankruptcy debtor's life insurance exemption is "not to exceed $2,000.00." Put simply, "not to exceed" means *not to exceed*. Georgia has explicitly declared that bankruptcy debtors in this situation—residents or not—may exempt $2,000 *at most*, and no more. For a bankruptcy debtor seeking this life insurance exemption in Georgia, the explicit language in § 44-13-100(a)(9) governs over the more general debtor language in § 33-25-11(c).

This helps distinguish *In re Meehan* and other similar cases relied upon by McFarland.  In *Meehan*, in particular, we held pursuant to 11 U.S.C. § 541(c)(2) that a bankruptcy debtor could exclude his IRA from the bankruptcy estate by using an "applicable" non-bankruptcy Georgia statute.  *In re Meehan*, 102 F.3d at 1210–12.  *Meehan*, however, made no mention of any Georgia statute specifically *barring* bankruptcy debtors from doing what the non-bankruptcy statute allowed debtors to do, more generally.  *Id.*; *see also Matter of Geise*, 992 F.2d 651, 657 (7th Cir. 1993) ("[A] brief glance at a collection of the state exemption statutes confirms, even in those states that have enacted specific statutory listings of exempt property, other statutory sections also have been considered exemptions.").  McFarland, on the other hand, is restricted to § 44-13-100(a)(9) because (at risk of sounding like a broken record) that statute *specifically limits* what bankruptcy debtors can exempt.

McFarland tries other arguments, none of which fare better.  For instance, he asserts Georgia Code § 44-13-100 "lacks any language prohibiting the Debtor from utilizing any state law exemptions outside of § 44-13-100."  Indeed, he points out, § 44-13-100(a) states a bankruptcy debtor "may" utilize its exemptions—not "must."  But this (once again) misses the point.  Even if Georgia, broadly speaking, does not prohibit a bankruptcy debtor from going outside Georgia's bankruptcy exemptions, the *specific* statute at issue here—§ 44-13-100(a)(9)—explicitly limits bankruptcy debtors in this particular life insurance situation to its provisions.  True,

16

a bankruptcy debtor in Georgia "may" decide not to utilize § 44-13-100(a)(9)—no one, after all, is going to force a bankruptcy debtor to exempt anything. If a bankruptcy debtor decides to exempt the cash value of a life insurance policy, though, we believe Georgia intended for that exemption "not to exceed $2,000.00."

## B. Constitutional analysis

We now address McFarland's alternative view that restricting bankruptcy debtors to § 44-13-100(a)(9) violates: (1) the Georgia Constitution's Equal Protection Clause;[9] and (2) the United States Constitution's Bankruptcy Clause.[10]

## 1. Section § 44-13-100(a)(9) does not violate equal protection

In Georgia, "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." Ga. Const. Art. I, § 1, para. 2. Where "no fundamental right or suspect class is involved, . . . statutory classifications are permitted when the classification is based on *rational* distinctions and bears a direct relationship to the purpose of the legislation." *Grissom v. Gleason*, 418 S.E.2d 27, 30 (Ga. 1992) (emphasis added); *see also Wood v. United States* (*In re*

---

[9] McFarland does not challenge Georgia's statutory scheme under the Equal Protection Clause found in the United States Constitution.

[10] McFarland also mentions a Supremacy Clause violation. His brief, however, fails to develop a preemption argument to any meaningful extent. Thus, we will not consider it here. *See United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) ("[A]n issue [is] abandoned when a defendant merely makes a passing reference to an alleged error in his brief." (citing *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003))).

*Wood*), 866 F.2d 1367, 1370 (11th Cir. 1989) ("Under the 'rational relationship' test, a court reviewing the constitutionality of a classification only may strike down the classification if the classification is without *any* reasonable justification." (emphasis in original)).  Ordinarily, we assume that "Legislatures . . . have acted constitutionally."  *Melton v. Gunter*, 773 F.2d 1548, 1551 (11th Cir. 1985) (quoting *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843 (1982)).

Although Georgia treats bankruptcy debtors differently than other debtors, this distinction does not violate Georgia's Equal Protection Clause because it is rational and relates directly to the purpose of bankruptcy legislation.  After all, one of the primary functions of bankruptcy is to "give the debtor a fresh start," *Menchise v. Akerman Senterfitt*, 532 F.3d 1146, 1151 (11th Cir. 2008), and doing so quite obviously requires a different legal scheme than that which applies to non-bankruptcy debtors.  *See In re Shumaker*, 124 B.R. 820, 827 (Bankr. D. Mont. 1991) ("[T]he Ohio Legislature treated bankrupt and non-bankrupt debtors differently.  The [permissible] rationale for the distinction is to provide the former with the requisite 'fresh start'.  Being fully aware of the unique problems confronting the bankrupt debtors' quest for financial rehabilitation, the Legislature employed reasonable classification of persons to accomplish this end." (quoting *Matter of Bloom*, 5 B.R. 451, 453 (Bankr. N.D. Ohio 1980))).  Thus, broadly speaking, state statutes do not violate equal protection when they deal with bankruptcy debtors differently than non-bankruptcy debtors.

18

In our present scenario, however, Georgia has imposed a *greater* burden on bankruptcy debtors than non-bankruptcy debtors by restricting them to $2,000. This twist makes our case somewhat unique in the annals of case law, but it does not mean Georgia acted irrationally. This is because giving debtors a "fresh start"—while important—is not the sole purpose of bankruptcy law. Rather, bankruptcy law is also designed "to collect all of the assets and liabilities of an entity [and] to pay the creditors of the bankrupt to the fullest extent possible." *Menchise*, 532 F.3d at 1151. In other words, states must balance the interests of both debtors *and* creditors when creating bankruptcy exemptions. This is no easy task. And because bankruptcy allows debtors to wipe their financial slate entirely clean, it is plausible that Georgia requires bankruptcy debtors to sacrifice *more* of their penumbral property (*e.g.*, a life insurance policy) in order to obtain greater relief on property more central to a "fresh start" (*e.g.*, a homestead exemption). *Compare* Ga. Code Ann. § 44-13-1 (Debtor, married or not, allowed residential exemption of $21,500), *with* Ga. Code Ann. § 44-13-100(a)(1) (Married *bankruptcy* debtor allowed residential exemption of $43,000).[11] *Cf. Taylor v. Age Fed. Credit Union* (*In re Taylor*), 3 F.3d 1512, 1516 (11th Cir. 1993) ("Allowing a

---

[11] This contrast was even starker when McFarland filed for bankruptcy in 2011. Prior to 2012, Georgia allowed a regular debtor a $5,000 residential exemption, whereas a bankruptcy debtor could exempt $10,000 and a *married* bankruptcy debtor could exempt $20,000.

19

[bankruptcy] debtor to retain property without reaffirming or redeeming gives the debtor not a 'fresh start' but a 'head start' . . . .").

To hold otherwise, on the scant evidence presented here, would essentially mean banning opt-out states from treating bankruptcy debtors worse than regular debtors on *any* specific issue.  This, ironically, would be irrational on *our* part, as it would unduly interfere with a state's prerogative to create its own bankruptcy exemptions.  In the end, because Georgia has at least rationally balanced the needs of creditors and bankruptcy debtors, it has not transgressed equal protection by treating bankruptcy debtors differently from non-bankruptcy debtors.

**2. Section 44-13-100(a)(9) does not violate the Bankruptcy Clause**

The United States Constitution vests Congress with the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. Art. I, § 8, cl. 4.  This Bankruptcy Clause is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI , cl. 2.

McFarland argues that restricting bankruptcy debtors to § 44-13-100(a)(9) creates a non-uniform application of bankruptcy law in violation of the Constitution.  So, whereas for equal protection McFarland argued Georgia's scheme was *irrational*, here he contends Georgia's scheme was not *authorized*— under the Bankruptcy Clause or, by extension, 11 U.S.C. § 522.

20

This issue is one of first impression in this circuit.  And it intrigues us, in no small part because the other circuits addressing the subject appear to have done so in the inverse context, where a *trustee* was claiming that a state could not constitutionally distinguish between a bankruptcy debtor and a non-bankruptcy debtor.  *See, e.g.*, *Richardson v. Schafer* (*In re Schafer*), 689 F.3d 601 (6th Cir. 2012); *Sheehan*, 574 F.3d 248; *Kulp v. Zeman* (*In re Kulp*), 949 F.2d 1106, 1109 n.3 (10th Cir. 1991); *see also Sticka v. Applebaum* (*In re Applebaum*), 422 B.R. 684 (9th Cir. BAP 2009).  Though the posture is reversed here, we nevertheless reach the same result as our sister circuits.  We believe states are authorized by statute and permitted by the Constitution to distinguish between bankruptcy and non-bankruptcy debtors in crafting bankruptcy exemptions.

First, with 11 U.S.C. § 522 Congress has permitted states to create, define, and implement bankruptcy exemptions and to restrict bankruptcy debtors to those exemptions.  Section 522(b)(3)(A), for instance, says bankruptcy debtors in opt-out states are restricted to "any property that is exempt . . . under State or local law *that is applicable*." (emphasis added).  Absent specific federal guidance to the contrary, states are obviously the sole authorities in determining whether state law is "applicable" to a class of debtors.  *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is

21

involved in a bankruptcy proceeding."). And § 522 contains no explicit restrictions indicating states must treat all debtors alike. The Fourth Circuit has summarized this well, holding that § 522

> affords the states the authority to restrict their respective residents to exemptions promulgated by the state legislatures, if they so choose. This statutory provision is an express delegation to the states of the power to create state exemptions in lieu of the federal bankruptcy exemption scheme. *Congress has not seen fit to restrict the authority delegated to the states by requiring that state exemptions apply equally to bankruptcy and non-bankruptcy cases . . . .*

*Sheehan*, 574 F.3d at 252 (emphasis added) (internal citation omitted); *see also In re Schafer*, 689 F.3d at 607 ("The *plain* language of § 522(b) demonstrates [*Sheehan*'s above proposition] *unambiguously . . . .*" (emphasis added)); *In re Kulp*, 949 F.2d at 1109 n.3 ("[Eleven] U.S.C. § 522 expressly delegates to states the power to create bankruptcy exemptions.").

And this statutory scheme is constitutionally valid. Like our sister circuits, we do not believe the Constitution's call for *bankruptcy* uniformity somehow requires states to treat bankruptcy and non-bankruptcy debtors exactly alike. *See In re Schafer*, 689 F.3d at 607 ("[A]n interpretation of § 522 that permits states to enact bankruptcy-specific exemptions schemes does not run afoul of either the Bankruptcy or Supremacy Clauses . . . ."); *Sheehan*, 574 F.3d at 252 ("[W]e are without authority to impose such a [uniformity] requirement."); *In re Kulp*, 949 F.2d at 1109 n.3 ("Defendants argue in the alternative that Colo. Rev. Stat. § 13–54–104 violates the constitution's uniformity requirement for bankruptcy laws

because it creates a bankruptcy exemption which is not available to other Colorado debtors.  This argument is meritless." (internal citations omitted)).[12]  *See also In re Applebaum*, 422 B.R. at 686 ("California's bankruptcy-only exemption statute . . . does not violate the Uniformity Clause.").

Binding precedent counsels in this direction, as well.  The most striking language is contained in *In re Wood*, 866 F.2d 1367.  There, quoting the Supreme Court, we emphasized that the Bankruptcy Clause "is not a straightjacket that forbids Congress to distinguish among classes of debtors."  *Id.* at 1372 (quoting *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 469, 102 S.Ct. 1169, 1176 (1982)).  Instead, we wrote, the Clause "only requires that bankruptcy laws apply uniformly among classes of debtors."  *Id*.  The Supreme Court has charted a similar path to ours.  *Gibbons*, after all, was the first (ever!) opinion *enforcing* bankruptcy uniformity against Congress, yet the Supreme Court still deployed the "not a straightjacket" language we quoted in *Wood*.  *See Gibbons*, 455 U.S. at 469, 102 S.Ct. at 1176.  Nearly a decade later, the Court added that the "Bankruptcy Code allows the States to define what property a debtor may exempt from the bankruptcy estate . . . .  *Nothing* in [11 U.S.C. § 522(b)] (or elsewhere in the Code) limits a State's power to restrict the scope of its exemptions; *indeed, it could*

---

[12]  The Tenth Circuit recently reaffirmed the viability of *In re Kulp* in a thorough (albeit unpublished) decision.  *See Williamson v. Murray* (*In re Murray*), 586 F. App'x 477, 481 (10th Cir. 2014) (observing that there is now a "consensus that bankruptcy-specific exemptions are constitutional").

*theoretically accord no exemptions at all*." *Owen v. Owen*, 500 U.S. 305, 306, 308, 111 S.Ct. 1833, 1834–35 (1991) (emphases added).  This language strongly suggests and supports the decision we reach today.[13]

McFarland fails to interact with this case law or the compelling arguments contained therein.  Instead, he cites (without much explanation) a smattering of bankruptcy court decisions, along with several older appellate decisions, that supposedly favor his position.  *See, e.g.*, *In re Regevig*, 389 B.R. 736 (Bankr. D. Ariz. 2008); *In re Cross*, 255 B.R. 25 (Bankr. N.D. Ind. 2000); *Matter of Reynolds*, 24 B.R. 344 (Bankr. S.D. Ohio 1982); *Kanter v. Moneymaker* (*In re Kanter*), 505 F.2d 228 (9th Cir. 1974); *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857 (1902).   In recent years, none of our sister circuits have found these cases compelling.  *See, e.g.*, *Williamson v. Murray* (*In re Murray*), 586 F. App'x. 477, 481 (10th Cir. 2014) (unpublished) ("Rather than directing us to intervening countervailing authority, Williamson's briefing offers this court a dog's breakfast of inapposite cases [and] overruled district court cases . . . .").  Neither do we.  The

---

[13]  True, the *Owen* Court indicated that a state's exemption power under "the opt-out policy [is not] absolute."  500 U.S. at 313, 111 S.Ct. at 1838.  The Court, however, said this power could be limited by "whatever other competing or limiting policies *the statute* [*i.e.*, § 522] contains." *Id.* (emphasis added).  In other words, the state's power will be limited if § 522 can be shown to require this outcome in a specific area.  Here, no such demonstration has been made.

24

clear weight of authority supports our position, and McFarland has not persuaded us otherwise.[14]

In summary, Georgia has not violated the Bankruptcy Clause.  A plain reading of § 522 does not, as McFarland alleges, allow a bankruptcy debtor to use a state exemption statute where the state itself has rendered the statute inapplicable. Rather, very near the opposite is true; states have been authorized to define and restrict the applicability of their bankruptcy exemptions.  And this authorization does not "fail to provide a uniform application of the Bankruptcy Code in violation of the Bankruptcy Clause," as McFarland asserts.  Although the authorization is not absolute, its boundaries have not been overstepped here.

## IV. CONCLUSION

For the foregoing reasons, McFarland is not entitled to the bankruptcy exemptions he claims on appeal.  The bankruptcy court did not clearly error with its factual findings, and we agree with its legal conclusions.

**AFFIRMED.**

---

[14]  The Supreme Court's decision in *Moyses* is perhaps the most intriguing case cited by McFarland.  The Sixth Circuit has explained in copious detail, however, why *Moyses* does not compel the result desired by McFarland here.  *See In re Schafer*, 689 F.3d at 610–11.  In short, although *Moyses* contains one sentence arguably favorable to McFarland, the decision itself was addressing a different issue than the one facing us here, and the Supreme Court actually *upheld* the constitutionality of the 1898 Bankruptcy Act.  *Id.* at 610.  Moreover, the Sixth Circuit noted, the language in question would prove too much if interpreted as broadly as McFarland urges. *See id.* ("[F]ull adherence to the language in *Moyses* on which the Trustee relies would call into doubt the constitutionality of the *federal* exemptions set forth in § 522(d)." (emphasis added)).