TORRUELLA, Circuit Judge
(Concurring in the judgment).
Since at least 1938, the definition of the term “States” in § 1(29) of the Bankruptcy Act included the Territories and possessions of the United States, making Puerto Rico’s municipalities eligible for federal bankruptcy protection.[33] All parties to this case agree that this is so. As provided in § 109(c)(2) of the Bankruptcy Reform Act of 1978, a municipality could be an eligible debtor under Chapter 9 if it was “generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to [so] authorize.”[34] This situation remained unchanged until 1984[35] when Congress enacted § 421(j)(6) of the Bankruptcy Amendments and Federal Judgeship Act of 1984[36] (the “1984 Amendments”), which — for the first time-eliminated Puerto Rico’s decades-long power to seek federal bankruptcy protection for its municipalities by amending § 101(52) to exclude Puerto Rico’s ability *347 under § 109(c)(2) to authorize a “debtor” for purposes of Chapter 9.
Because there is no dispute that under the pre-1984 federal bankruptcy laws, Puerto Rico had — as did all the states— the power to authorize its municipalities to file for the protection of Chapter 9,1 agree with the majority’s conclusion that the 1984 Amendments are the “key to this case.”
Although I also agree that Puerto Rico’s Recovery Act contravenes § 903(1) — which applies uniformly to Puerto Rico, together with the rest of Chapter 9 — and thus is invalid, I am compelled to write separately in order to note that the 1984 Amendments are equally invalid. Not only do they attempt to establish bankruptcy legislation that is not uniform with regards to the rest of the United States, thus violating the uniformity requirement of the Bankruptcy Clause of the Constitution,[37] but they also contravene both the Supreme Court’s and this circuit’s jurisprudence in that there exists no rational basis or clear policy reasons for their enactment. See Harris v. Rosario, 446 U.S. 651, 651-52, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (“Congress, which is empowered under the Territory Clause of the Constitution ... to ‘make all needful Rules and Regulations respecting the Territory ... belonging to the United States,’ may treat Puerto Rico differently from States so long as there is a rational basis for its actions.” (emphasis added)) (per curiam); Califano v. Torres, 435 U.S. 1, 5, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam); Cordova & Simon-pietri Ins. Agency, Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 41-42 (1st Cir.1981) (“We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state.” (emphasis added)).
Furthermore, to assume that the 1984 Amendments are a valid exercise of Congress’s powers to manage the local financial affairs of Puerto Rico’s municipalities is inconsistent with this court’s long-lasting Commonwealth-endorsing case law. Finally, I also take issue with the majority’s proposal that Puerto Rico simply ask Congress for relief; such a suggestion is preposterous given Puerto Rico’s exclusion from the federal political process.
I. Congress’s Uniform Power under the Bankruptcy Clause
In enacting the 1984 Amendments, Congress acted pursuant to the power enumerated in the Bankruptcy Clause, which states that “Congress shall have the power ... [t]o establish ... uniform laws on the subject of bankruptcies throughout the United States.” U.S. Const, art. I, § 8, cl. 4. The term “uniform” is unequivocal and unambiguous language, which is defined as “always the same, as in character or degree; unvarying,” [38] and as “[characterized by a lack of variation; identical or consistent.”[39] Prohibiting Puerto Rico from authorizing its municipalities to request Chapter 9 relief, while allowing all the states to benefit from such power, is hardly in keeping with these definitions.[40] It would be absurd to *348 argue that the exclusion of Puerto Rico from the protection of the Bankruptcy Code by the enactment of the 1984 Amendments is not prohibited by the unequivocal language of the Bankruptcy Clause of the Constitution. This should end the analysis of Congress’s powers under the Constitution, as “reliance on legislative history is unnecessary in light of the statute’s unambiguous language.” Mohamad v. Palestinian Auth., — U.S. -, 132 S.Ct. 1702, 1709, 182 L.Ed.2d 720 (2012) (quoting Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 236 n. 3, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010)); see also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (“[W]e do not resort to legislative history to cloud a statutory text that is clear.” (alteration in original) (quoting Ratzlafv. United States, 510 U.S. 135, 147-148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994))).
Even if we did turn to legislative history, there is little in the Federalist Papers, or elsewhere in our canonical sources, to aid us in finding any hidden meaning to the clear language of the Bankruptcy Clause.[41] This gives added weight to the conclusion that the language in the Clause means what it unequivocally states: bankruptcy laws must be uniform throughout the United States or else are invalid. See Daniel A. Austin, Bankruptcy and the Myth of “Uniform Laws,” 42 Seton Hall L.Rev. 1081, 1141-47 (2012); Judith Schenck Koffler, The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity, 58 N.Y.U. L.Rev. 22, 99 (1983).
Although Congress’s powers under the Bankruptcy Clause are broad,[42] they are nonetheless limited by the Clause’s uniformity requirement, which is geographical in nature. Ry. Labor Execs. Ass’n v. Gibbons, 455 U.S. 457, 471, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982) (“A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over the debtor.” (citing In Re Sink, 27 F.2d 361, 363 (W.D.Va. 1928), appeal dismissed per stipulation, 30 F.2d 1019 (4th Cir.1929))). “The uniformity requirement ... prohibits Congress from enacting a bankruptcy law that ... applies only to one regional debtor. To *349 survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors.” Id. at 473, 102 S.Ct. 1169; cf. Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 159, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).
II. The 1984 Amendments Fail the Rational Basis Requirement
The non-uniform treatment of Puerto Rico under the bankruptcy laws not only violates the Bankruptcy Clause, but also fails the rational basis requirement. As explained above, Harris, 446 U.S. at 651-52, 100 S.Ct. 1929, and Califano, 435 U.S. at 5, 98 S.Ct. 906, held that Congress may legislate differently for Puerto Rico, as long as it has a rational basis for such disparate treatment. These were equal protection and substantive due process cases brought by U.S. citizens of Puerto Rico who challenged Congress’s discriminatory treatment in certain welfare programs. The plaintiffs in these cases claimed to have been discriminated against based on their classification as Puerto Ri-cans, an insular minority purportedly subject to heightened scrutiny. However, the Supreme Court rejected their argument, holding that, pursuant to Congress’s powers under the Territorial Clause, only rational basis review is warranted when considering the validity of a statute that treats Puerto Rico differently. Harris, 446 U.S. at 651-52, 100 S.Ct. 1929; Califano, 435 U.S. at 5, 98 S.Ct. 906.[43]
It is black letter law that this tier of scrutiny “is a paradigm of judicial restraint,” FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and courts should not question “[rjemedial choices made by ... legislative ... bod[ies] [unless] ‘there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government’s legitimate goals.’ ” Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir.2005) (quoting Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 54 (1st Cir. 2005)).
This implies that Congress’s justification for its legislative actions need not be expressly articulated, and thus the action of removing Puerto Rico’s power to authorize its municipalities to file under Chapter 9 must be allowed if there is any set of conceivable reasons rationally related to a legitimate interest of Congress. See Beach Commc’ns, 508 U.S. at 313, 113 S.Ct. 2096 (“[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenges if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.”). Furthermore, in order to pass rational basis review, legislation cannot be arbitrary or irrational. See City of Cle-burne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (“The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.”). Here, there is no conceivable set of facts rationally related to a legitimate purpose of Congress in these amendments, and thus these amendments are invalid.
This legislation unreasonably and arbitrarily removed a power delegated to Puerto Rico by the previous legislation. Had there been any justification for not *350 granting Puerto Rico the managerial power to authorize its municipalities to seek bankruptcy protection before 1984, Congress certainly did not express or even imply it at any time up to and including the present. How could such a justification arbitrarily materialize without explanation?
A. The 1984 Amendments Lack any Record or Justification
As previously stated, there is no legislative record on which to rely for determining Congress’s reasons behind the 1984 Amendments. A tracing of its travels through the halls of Congress sheds less light than a piece of coal on a moonless night regarding the reason for its enactment. Thus, the majority’s statement that “Congress [sought to] preserve to itself th[e] power to authorize Puerto Rican municipalities to seek Chapter 9 relief,”[44] is pure fiction. There is absolutely nothing in the record of the 1984 Amendments to justify this statement or Congress’s legitimate purpose in adopting them.
The Puerto Rico exception actually predates the 1984 Act. It appeared out of thin air during the 96th Congress in 1980 in a House Report, accompanying S. 658. See H.R.Rep. No. 96-1195, at 38 (1980). That proposal was a failed bill similar in substance to Pub.L. No. 98-353, which later became the Bankruptcy Amendments and Federal Judgeship Act of 1984, 98 Stat. 333. See 98 Stat. 36869 (containing the Puerto Rico language under “Subtitle H-Miscellaneous Amendments to Title 11”). When S. 658 arrivéd in the House from the Senate, on September 11, 1979, it did not contain the Puerto Rico-excluding language. The Puerto Rico provision was, however, included in the version that emerged from the House Committee on the Judiciary on July 25, 1980. There is no legislative history on the Puerto Rico clause, as hearings from the House Committee on the Judiciary from 1979-1980 reveal nothing about the amendment’s purpose or justification.
The story was not very different with regard to the 1984 Amendments. On March 21, 1984, the House passed H.R. 5174 without the Chapter 9 debtor eligibility exclusion for Puerto Rico. On that same day, Senator Strom Thurmond (R-SC) introduced S. Arndt. 3083. Subtitle I, section 421(j)(6) of the amendment proposed altering Section 101 of Title 11 to provide that “(44) ‘State’ includes the District of Columbia and Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title.” 130 Cong. Rec. S6118 (daily ed.May 21, 1984) (statements of Sen. Thurmond). And that is how we got the current text of 11 U.S.C. § 101(52). On the day that he introduced the amendment, Senator Thurmond addressed the Senate to explain several of its numerous stipulations, yet said little about the newly added Puerto Rico exemption. He noted, “Subtitles C through I contain the remaining substantive provisions passed by the Senate in S. 1013. These provisions were not in the House bill. They do, however, have broad support in the Senate and were therefor included in the substitute amendment.” 130 Cong. Rec. S6083 (daily ed.May 21, 1984) (statement of Sen. Thurmond).
The original S. 1013 also did not contain the Puerto Rico exclusion when it was reported in the Senate on April 7, 1983. Senators Dole, Thurmond, and Hefflin introduced Amendment 1208 on April 27, 1983, which contained the Puerto Rico Chapter 9 debtor eligibility exclusion. 129 Cong. Rec. S5441 (daily ed.Apr. 27, 1983). The Senators gave no explanation for the *351 Puerto Rico exclusion in S. 1013. Thurmond described Subtitle I of Amendment 3083 as “Technical Amendments to Title 11,” which is consistent with the rest of the statute and gave no further reasons for its inclusion. 130 Cong. Rec. S6083 (daily ed.May 21, 1984) (Statement of Sen. Strom Thurmond). The Senate Amendments to H.R. 5174, including 3083, passed on June 20, 1984. The Congressional Record from the House on that day announced that “the Senate insists upon its amendments” and therefore it would have to conference with the House which was not in agreement with them. 130 Cong. Rec. H6085 (daily ed.June 20,1984).
The House adopted the Conference Report, including the Puerto Rico exclusion, without specific mention or comment on June 28, 1984, with a vote of 394 yeas, 0 nays, and 39 abstentions. The Senate also voted for the Conference Report, thereby making H.R. 5174 into Public Law No. 98-353. Congress never articulated a reason for the Puerto Rico-excluding language.
To ignore this silence is striking given that the central task for courts when interpreting changes to the bankruptcy statutes is to carefully examine Congress’s statutory text and justifications. See Cohen v. de la Cruz, 523 U.S. 213, 221, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (“We ... ‘will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.’ ” (citation omitted)); United Sav. Ass’n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 380, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (“Such a major change in the existing rules would not likely have been made without specific provision in the text of the statute; it is most improbable that it would have been made without even any mention in the legislative history.” (citation omitted)); ef. Kellogg Brown & Root Servs. Inc. v. United States ex rel. Carter, — U.S. -, 135 S.Ct. 1970, 1977, 191 L.Ed.2d 899 (2015) (“Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move.”).
Tellingly, the parties do not dispute this absolute lack of Congressional justification for the Puerto Rico language in the 1984 Amendments. See also Frank R. Kennedy, The Commencement of a Case under the New Bankruptcy Code, 36 Wash. & Lee L.Rev. 977, 991 n. 75 (1979) (“While there may be special reasons why Washington, D.C., should not be eligible for relief under Chapter 9, it is not self-evident why all political subdivisions, public agencies, and instrumentalities in Puerto Rico, Guam, and other territories and possessions of the United States should be precluded from relief under the chapter.”).
And yet, there is one undisputed fact that is self-evident in all this: no one proposed a need for the 1984 change, or protested the efficacy of the Code as it existed without this amendment. There is hermetic silence regarding all of the issues or questions that would normally arise and be discussed when a provision that was on the Bankruptcy Code for close to half a century, and whose elimination would affect millions of U.S. citizens, is deleted.
B. Congress’s Power over Puerto Rico’s Internal Affairs
The 1984 Amendments deprived Puerto Rico of a fundamental and inherently managerial function over its municipalities that has no connection to any articulated or discernible Congressional interest. See Bennett v. City of Holyoke, 362 F.3d 1, 12 (1st Cir.2004) (explaining that “municipalities are creatures of the state” subject to control of the state’s legislature). All the states and territories — including Puerto Rico before 1984 — had the power to control, manage, and regulate the local finan *352 cial affairs of their municipalities. See Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 513-15, 62 S.Ct. 1129, 86 L.Ed. 1629 (1942); Armstrong v. Goyco, 29 F.2d 900, 902 (1st Cir.1928) (“In the matter of local regulations and the exercise of police power Porto Rico possesses all the sovereign powers of a state, and any exercise of this power which is reasonable and is exercised for the health, safety, morals, or welfare of the public is not in contravention of the Organic Act nor of any provision of the Federal Constitution.”). As the Court explained in Faitoute Iron & Steel Co.,
Can it be that a power that ... was carefully circumscribed to reserve full freedom to the states, has now been completely absorbed by the federal government — that a state which ... has ... elaborated] machinery for.the autonomous regulation of problems as peculiarly local as the fiscal management of its own household, is powerless in this field? We think not.
316 U.S. at 508-09, 62 S.Ct. 1129; see also New York v. United States, 505 U.S. 144, 156-57, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (explaining that the structure of the Constitution protects the rights of the states to control their internal affairs). Puerto Rico has the same level of authority over its municipalities. See United States v. Laboy-Torres, 553 F.3d 715, 722-23 (3d Cir.2009) (O’Connor, J., sitting by designation) (“[C]ongress has accorded the Commonwealth of Puerto Rico ‘the degree of autonomy and independence normally associated with States of the Union.’ ”) (quoting United States v. Girino, 419 F.3d 1001, 1003-04 (9th Cir.2005) (per curiam)).
When the Supreme Court held in 1976 that Puerto Rico has “[t]he degree of autonomy and independence normally associated with States of the Union,”[45] it reaffirmed this proposition, which had longstanding vitality even before the 1984 Amendments or the enactment of the Federal Relations Act[46] and the creation of the so-called “Commonwealth status.” See Puerto Rico v. Shell Co., 302 U.S. 253, 261-62, 58 S.Ct. 167, 82 L.Ed. 235 (1937) (“The aim of the Fo-raker Act and the Organic Act was to give Puerto Rico full power of local self-determination with an autonomy similar to that of the states and incorporated territories.”).
Even this court has questioned the basis for Congress’s power to legislate over Puerto Rico local affairs. In' one of its Commonwealth-endorsing decisions dealing with the question of whether Congress had the intention to limit Puerto Rico’s powers to regulate internal antitrust violations through the Sherman Act’s control of purely local affairs of the territories, the court held that “[t]he states are clearly able to adopt such variations as to purely local matters. And, there is no reason of policy discernible in the Sherman Act for treating Puerto Rico differently.” Cordo-va, 649 F.2d at 42 (emphasis added).[47] The court went on to explain how Congress’s power to legislate purely local af *353 fairs of Puerto Rico is constrained: “We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs, of post-Constitutional Puerto Rico than into the local affairs of a state.” Id. at 42 (emphasis added); see also Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 322 (1st Cir.2012).
In the instant case, there are no articulated or conceivable “clear policy reasons.” And while the “specific evidence” requirement could be met by the clear statutory text of the 1984 Amendments, this court has stated that Congress’s powers to legislate differently for Puerto Rico under the Territorial Clause are also subject to some “outer limits,” in addition to the rational-basis constraints of Harris and Califano. See Jusino-Mercado, 214 F.3d at 44. At a minimum, there should be some explanation as to why Congress’s enactment of the 1984 Amendments fits within those “outer limits” given the complete absence of clear policy reasons.
Congress has expressly delegated to Puerto Rico the power to manage its municipalities. Section 37 of the Federal Relations Act provides:
That the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable, including power to create, consolidate, and reorganize the municipalities so far as may be necessary, and to provide and repeal laws and ordinances therefor; also the power to alter, amend, modify, or repeal any or all laws and ordinances of every character now in force in Puerto Rico or municipality or district thereof, insofar as such alteration, amendment, modification, or repeal may be consistent with the provisions of this Act.
P.R. Laws Ann. tit. 1, Federal Relations Act § 37; Federal Relations Act, Pub.L. No. 64-368, § 37, 39 Stat. 951, 954 (1917), as amended by Act of July 3, 1950, Pub.L. No. 81-600, 64 Stat. 319 (codified at 48 U.S.C. § 821).[48]
This court has further reiterated the norm that Puerto Rico has authority to control its internal affairs in several other Commonwealth-endorsing decisions. See, e.g., United States v. Quinones, 758 F.2d 40, 42 (1st Cir.1985) (“Puerto’ Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution [T]he government of Puerto Rico is no longer a federal government agency exercising delegated power.”); Cordova, 649 F.2d at 41. Because Congress was precluded from enacting the 1984 Amendments, they cannot serve a legitimate purpose and are therefore irrational.
The degree of authority granted to Puerto Rico to regulate its local affairs is very different from Congress’s exclusive powers over the District of Columbia, the other territory excluded by § 101(52) from authorizing its municipalities under § 109(c)(2) of the Bankruptcy Code. See Trailer Marine Transp. Corp., 977 F.2d at 8 (“If the government of Puerto Rico were nothing other than the alter ego or imme *354 diate servant of the federal government, then the dormant Commerce Clause doctrine would have no pertinence, for a doctrine designed to safeguard federal authority against usurpation has no role'when the federal government itself is effectively the actor.”); cf. Palmore v. United States, 411 U.S. 389, 397, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (“Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes.”); Berman v. Parker, 348 U.S. 26, 31, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (“The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.”).
Any comparison of Puerto Rico to the District of Columbia, therefore, including the proposition made by the majority that Congress may have intended to retain plenary powers to regulate the local affairs of Puerto Rico as it does for the seat of the Federal Government, fundamentally changes the current nature of Puerto Rico-federal relations. To argue that Congress’s rationale for the disparate treatment enacted in the 1984 Amendments is that it may have wanted to adopt “other— and possibly better — options to address the insolvency of Puerto Rico municipalities”[49] overturns over half a century of binding case law that purported to recognize that Congress delegated to Puerto Rico the power to control its municipalities and legislate for its local affairs. Congress’s solution to the budgetary and fiscal crisis faced by the District of Columbia during the mid-1990s, through the enactment of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. No. 104-8, 109 Stat. 97, could have been taken for granted considering that the Federal Government and Congress itself would be directly affected by the District’s financial crisis. But, the circumstances here are very different, since no such sense of urgency is evident in Congress, nor is the requisite political clout available to Puerto Ricans. And, even if it were, instituting direct Congressional control of Puerto Rico’s finances through a financial control board would require fundamentally redefining Puerto Rico’s relationship to the United States. See Flores de Otero, 426 U.S. at 594, 96 S.Ct. 2264.
Without an adequate explanation, the majority chooses to ignore our own binding case law and suggests that Congress chose to unreasonably interfere with a managerial decision affecting Puerto Rico’s local municipal affairs. Although Congress may, in special circumstances, legislate to amend or repeal uniform bankruptcy legislation, such an act, on a totally silent record, cannot be rational considering the long and substantiated jurisprudence that militates to the contrary.
C. Rational Basis Review After Harris and Califano
This is an extraordinary case involving extraordinary circumstances, in which the economic life of Puerto Rico’s three-and-a-half million U.S. citizens hangs in the balance; this court should not turn a blind eye to this critical situation by ignoring Congress’s constraints to legislate differently for Puerto Rico.[50] Besides being irrational and arbitrary, the exclusion of Puerto Rico’s power to authorize its municipalities to request federal bankruptcy *355 relief, should be re-examined in light of more recent rational-basis review case law. In certain cases, where laws have been found to be arbitrary and unreasonable, and where minorities have been specifically targeted for discriminatory treatment, judicial deference — even under such a deferential rational — basis standard-must yield. See United States v. Windsor; - U.S. -, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (“The Constitution’s guarantee of equality ‘must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot’ justify disparate treatment of that group.”) (quoting Dep’t of Agric. v. Moreno, 413 U.S. 528, 534-35, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). Moreover,' this Court has recognized that “Supreme Court equal protection decisions have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited permissible justification.” Massachusetts v. Dep’t of Health & Human Servs., 682 F.3d 1, 10 (1st Cir.2012).. “[T]he usually deferential ‘rational basis’ test has been applied with greater rigor in some contexts, particularly those in which courts have had reason to be concerned about possible discrimination.” Id. at 11 (citing United States v. Then, 56 F.3d 464, 468 (2d Cir.1995) (Calabresi, J., concurring)). Rightly so, because, when facing “historic patterns of disadvantage suffered by the group adversely affected by the statute ... [t]he Court ... undertake[s] a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review.” Id. The 1984 Amendments are just another example of a historic pattern of disadvantage suffered by Puerto Rico, but no such careful assessment is performed. See Igartúa-De La Rosa v. United States, 626 F.3d 592, 612 (1st Cir.2010) (Torruella, J., concurring in part, dissenting in part) (“This is a most unfortunate and denigrating predicament for citizens who for more than one hundred years have been branded with a stigma of inferiority, and all that follows therefrom.”).
A less-deferential rational basis review should also be performed in light of the aforementioned considerations regarding the well-settled law of Puerto Rico’s authority over its internal matters. See Dep’t of Health & Human Servs., 682 F.3d at 11-12 (“Supreme Court precedent relating to federalism-based challenges to. federal laws reinforce the need for closer than usual scrutiny ... and diminish somewhat the deference ordinarily accorded.”).
III. This Court Now Sends Puerto Ricans to Congress
The justification for the degree of judicial deference afforded by our constitutional jurisprudence under the typical rational basis review is founded on the basic democratic tenet that, “absent some reason to infer antipathy,” courts should not intervene with legislative choices because “even improvident decisions will eventually be rectified by the democratic process.... ” Beach Commc’ns, 508 U.S. at 314, 113 S.Ct. 2096 (quoting Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). And, while the democratic process was equally foreclosed to Puerto Ri-cans at the time Harris and Califano were resolved, here the situation is different because, contrary to the Supreme Court’s statements in those two cases, we have not been presented with a single plausible explanation of why Congress opted for the disparate treatment of Puerto Rico.
The majority offers Puerto Rico the alternative to seek a political solution in Congress and cites proposed changes in the relevant legislation pending before Congress to show that Puerto Rico is advancing in that direction. While I acknowledge that, in some contexts, the fact *356 that Congress has taken steps to remedy a purportedly unfair statutory distinction may be relevant to avoiding judicial intervention under rational basis review, see Vance, 440 U.S. 93 at n. 12, 99 S.Ct. 939, when Puerto Rico is effectively excluded from the political process in Congress, this is asking it to play with a deck of cards stacked against it,[51] something this same panel of this court has previously recommended, but to no avail.[52]
IV. The “Business-as-Usual” Colonial Treatment Continues
The majority’s disregard for the arbitrary and unreasonable nature of the legislation enacted in the 1984 Amendments showcases again this court’s approval of a relationship under which Puerto Rico lacks any national political representation in both Houses of Congress and is wanting of electoral rights for the offices of President and Vice-President. That discriminatory relationship allows legislation — such as the 1984 Amendments — to be enacted and applied to the millions of U.S. citizens residing in Puerto Rico without their participation in the democratic process. This is clearly a colonial relationship, one which violates our Constitution and the Law of the Land as established in ratified treaties.[53] Given the vulnerability of these citizens before the political branches of government, it is a special duty of the courts of the United States to be watchful in their defense. As the Supreme Court pronounced in United States v. Carotene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), “prejudice against ... insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.” I am sorry to say this special duty to perform a “more searching inquiry” has been woefully and consistently shirked by this court when it comes to Puerto Rico, with the majority opinion just being the latest in a series of such examples.[54]
When the economic crisis arose, after considering Congress’s cryptic revocation *357 of Puerto Rico’s powers to manage its own internal affairs through the 1984 Amendments, Puerto Rico looked elsewhere for á solution. It developed the Recovery Act enacted pursuant to the police powers this very court had sustained, to fill the black hole left by the 1984 Amendments introducing of the definition now codified in § 101(52). And while I agree with the majority that Puerto Rico could not take this step because Chapter 9 applies to Puerto Rico in its entirety, I commend the Commonwealth for seeking ways to resolve its predicament.
Even if one ignores the uncertain outcome of any proposed legislation, questions still remain: why would Congress intentionally take away a remedy from Puerto Rico that it had before 1984 and leave it at the sole mercy of its creditors? What legitimate purpose can such an action serve, other than putting Puerto Rico’s creditors in a position that no other creditors enjoy in the United States? While favoring particular economic interests— i.e., Puerto Rico creditors — to the detriment of three-and-a-half million U.S. citizens, is perhaps “business as usual” in some political circles, one would think it hardly qualifies as a rational constitutional basis for such discriminatory legislation.
V. Conclusion
The 1984 Amendments are unconstitutional. Puerto Rico should be free to authorize its municipalities to file for bankruptcy protection under the existing Chapter 9 of the Bankruptcy Code if that is the judgment of its Legislature.
I concur in the Judgment.

. See Act of June 22, 1938, Pub.L. No. 75-696, ch. 575, § 1(29), 52 Stat. 840, 842.

. Pub.L. No. 95-598, § 109(c)(2), 92 Stat. 2549, 2557. The current text requires "specific'' authorization by State law rather than "general” authorization. 11 U.S.C. § 109(c)(2).

. The majority accurately recounts the legislative path of the predecessors to the bankruptcy section presently in controversy. See Maj. Op. at 329-30.

. Pub.L. No. 98-353, sec. 421(j)(6), § 101(44), 98 Stat. 333, 368-69 (codified as amended at 11 U.S.C. § 101(52)).

. U.S. Const, art. I, § 8, cl. 4.

. The American Heritage Dictionary of the English Language 1881 (4th ed.2000).

. Black’s Law Dictionary, 1761 (10th ed.2014).

.Any effort to understand rather than rewrite the Bankruptcy Clause must accept and apply the presumption that the lawmakers used words in “their natural and ordinary signification.” Pensacola Tel. Co. v. W. Union Tel. Co., 96 U.S. 1, 12, 24 L.Ed. 708 (1878). *348 Furthermore, it has long been established as a fundamental rule of statutory construction that lawmakers do not use terms in enactments that "have no operation at all.” Marbury v. Madison, 1 Cranch 137, 174, 2 L.Ed. 60 (1803) ("[0]ur task is to apply the text, not to improve upon it.”); see also Pavelic & LeFlore v. Marvel Entm’t Grp. Div. of Cadence Indus. Corp., 493 U.S. 120, 126, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

. See The Federalist No. 42, at 237 (James Madison) (Robert A. Ferguson, ed., 2006) ("The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent many frauds where the parties or property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.”). No further comment is found before the Bankruptcy Clause was incorporated into the Constitution as it presently appears. It also bears noting that the Congressional powers to regulate commerce uniformly under the Commerce Clause— which contains language identical to the Bankruptcy Clause — apply in full force to Puerto Rico. See Trailer Marine Transp. Corp. v. Rivera Vázquez, 977 F.2d 1, 8 (1st Cir.1992) ("The central rationale of [the] dormant Commerce Clause doctrine ... is ... to foster economic integration and prevent local interference with _ the flow of the nation’s commerce. This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puer-to Rico as to any state in the Union.” (citation omitted)).

. See Cont’l Ill. Nat’l Bank v. Chicago, R.I. & Pac. Ry. Co., 294 U.S. 648, 668, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

. The same rational basis requirement that regulates disparate treatment of Puerto Ri-cans applies to the Commonwealth itself. See Jusino Mercado v. Puerto Rico, 214 F.3d 34, 44 (1st Cir.2000) (citing Harris, 446 U.S. at 651-52, 100 S.Ct. 1929) (recognizing that Congress could have legislated differently for the Commonwealth).

. Maj. Op. at 350.

. Examining Bd. of Eng’rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

. Act of July 3, 1950, Pub.L. No. 81-600, ch. 446, 64 Stat. 319 (codified at 48 U.S.C. § 731b etseq.); 48 U.S.C. § 821.

. As in Cordova, there is no discernible policy justification _ in the Bankruptcy Code to support the conclusion that Congress intended to control the purely local affairs of Puerto Rico. In fact, if anything, the policy reasons embodied in the constitutional requirement that bankruptcy legislation be uniform throughout the United States would support the opposite conclusion. The 1984 Amendments clearly violate the constitutional policy mandate. (

. For a more detailed description of Puerto Rico's powers to control its internal affairs, even before the "Commonwealth status,” see, e.g., People of Puerto Rico v. E. Sugar Assocs., 156 F.2d 316, 321 (1st Cir.1946) (“[T]his grant of legislative power with respect to local matters ... is as broad and comprehensive as language could make it____ [T]he legislative powers conferred upon the Insular Legislature by Congress are nearly, if not quite, as extensive as those exercised by the state legislatures.” (citations and internal quotation marks omitted)); González v. People of Porto Rico, 51 F.2d 61, 62 (1st Cir.1932) (quoting Armstrong, 29 F.2d at 902).

. Maj. Op. at 337.

. See Maj. Op. 326.

. Pursuant to the majority's construction of the statutory text, obtaining Congress's authorization to file for Chapter 9 protection would imply a procedure that need not require the enactment of a statute. Regardless of this, Puerto Rico has no political representation in Washington, other than a non-voting member of Congress. See, e.g., Igartúa-De La Rosa v. United States, 417 F.3d 145, 159 (1st Cir.2005) (Torruella, J., dissenting); Juan R. Torruella, Hacia Dónde Vas Puerto Rico? Puerto Rico, 107 Yale L.J. 1503, 1519-20 (1998) (reviewing José Trías Monge, The Trials of the Oldest Colony in the World (Yale University Press, 1997)) (''[T]hat Puerto Rico has a 'representative' in Congress without a vote is not only a pathetic parody of democracy within the halls of that most democratic of institutions, but also a poignant reminder that Puerto Rico is even more of a colony now than it was under Spain.”).

. See Sánchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 103 (1st Cir.2012) (stating in dismissing a claim against the United States' for injuries caused by the Navy's pollution of Vieques, that "the plaintiffs’ pleadings, taken as true, raise serious health concerns. [ ... ] The Clerk of Court is instructed to send a copy of this opinion to the leadership of both the House and Senate.”); see also id. at 120 (Torruella, J., dissenting) ("Access to the political forum available to most other citizens of the United States has already been blocked by this same Court.” (citations omitted)).

. See Igartúa-De La Rosa, 417 F.3d at 185-86 (Howard, J., dissenting) (questioning the U.S. Senate's declaration that the International Covenant on Civil and Political Rights, ratified by Congress in 1992, is not self-executing).

. See, e.g., Igartúa-De La Rosa, 626 F.3d at 612; Igartúa-De La Rosa, 417 F.3d at 159; Igartúa-De La Rosa v. United States, 229 F.3d 80, 85 (1st Cir.2000) (Torruella, J., concurring); López v. Arán, 844 F.2d 898, 910 (1st *357 Cir.1988) (Torruella, J., concurring in part and dissenting in part); see also Juan R. Tor-ruella, The Insular Cases: A Declaration of Their Bankruptcy and My Harvard Pronouncement 61 (Gerald L. Neuman and Tomiko Brown-Nagin eds., 2015).